**INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., et al., Plaintiffs,**

v.

**John F. EVANS, General Manager, et al., Defendants.**

No. C–2–77–632.

United States District Court, S. D. Ohio, E. D.

Aug. 25, 1977.

Carl Fry, Columbus, Ohio, for plaintiffs.

William J. Brown, Atty. Gen., State of Ohio, Columbus, Ohio by Gary E. Brown, Asst. Atty. Gen., Columbus, Ohio, for defendants John F. Evans and J. Ronald Castell; by Rodney Teague, Asst. Atty. Gen., Columbus, Ohio, for defendant John M. Stackhouse.

## OPINION AND ORDER

JOSEPH P. KINNEARY, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction. An initial motion for a temporary restraining order was denied by this Court and the matter set down for an expedited hearing on August 23, 1977. At the hearing the parties stipulated that the trial on the merits could be advanced and consolidated with the hearing on the application for preliminary relief, as permitted by Rule 65(a)(2), Federal Rules of Civil Procedure, and this Court so ordered. Based upon the evidence adduced at that hearing, on plaintiffs' verified complaint, and on stipulated facts submitted by the parties, this Court now makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiffs, both named the International Society for Krishna Consciousness, Inc., are separate religious corporations. One is incorporated under the laws of the State of New York and the other under the laws of the State of Ohio. They are bringing this action on behalf of themselves and their members.

2. Defendants are natural persons closely connected with the management and operation of the 1977 Ohio State Fair in Columbus, Ohio. John F. Evans is the General Manager of the Fair; J. Ronald Castell is the Chairman of the Ohio Expositions Commission; and John M. Stackhouse is the Director of the Ohio Department of Agriculture.

3. The Ohio Expositions Commission [hereinafter Expo] was created by statute for the purpose, essentially, of conducting the annual Ohio State Fair. In that capacity, it may enter into contracts, grant leases, and adopt necessary rules and regulations to assist in its conduct of the fair. It receives approximately $562,000.00 of its annual operating budget of some $5,000,-000.00 from the General Assembly of the State of Ohio. The remainder of the oper-

ating budget of Expo is derived from admissions and rental of booth space. Defendant Stackhouse is an ex officio member of Expo.

4. Pursuant to statutory authority, the Ohio Department of Agriculture has adopted regulations for the conduct of county fairs. Expo has chosen to adhere to these regulations in its conduct of the Ohio State Fair but there is no evidence that they were adopted in any formal meeting or proceeding.

5. One of these regulations is Regulation 901–7–06, formerly known as Regulation AG–3–02.05, which provides:

Every concessionaire and agent shall work only in front of his own concession and shall not be over (4) feet from his concession while working at the fair.

6. Another regulation, number 901–7–22, formerly known as Regulation AG–3–02–21, provides:

No roving vendor or solicitor, acting from either a profit or nonprofit organization or on his own behalf, shall be permitted on the fairgrounds except within the immediate area of the grandstand or coliseum. All solicitations for either contributions or sale must be made from within the confines of a booth or display unless otherwise exempted by this regulation or AG–3–02.05 [now 901–07–06].

7. Although there is no evidence directly establishing this proposition, it may be inferred from materials accompanying plaintiffs' motion for a temporary restraining order that the practice of the Krishna Consciousness religion includes participation in the ritual known as "Sankirtan." Sankirtan is directed toward publicly disseminating the views of the Krishna Consciousness religion, attracting new members, and obtaining through individual contributions the funds necessary to support the society's religious activities.

8. Sankirtan is commonly practiced by approaching a member of the public and offering that person a small token gift, such as a flower or an incense stick. If further interest is shown, the person is offered a magazine or book and an attempt is made to explain the purposes of the Krishna Consciousness religion and to solicit a voluntary donation. If no contribution is made, the person is asked to return the magazine or book but no attempt is made to recover the token gift.

9. There was a conflict in testimony concerning the tendency of this encounter to remain peaceful when the passerby's reaction was ambivalent or negative. For purposes of this proceeding, this Court assumes that the devotees of the Krishna Consciousness religion are encouraged to conduct themselves peacefully during the exercise of Sankirtan and that most encounters are, in fact, peacefully carried out.

10. Sometime prior to June 24, 1977, contact was established between authorized representatives of the plaintiffs and of Expo. Plaintiffs indicated at that time their desire to practice Sankirtan at the Ohio State Fair.

11. In these negotiations the representatives of Expo advised plaintiffs that regulations prohibited roving solicitations and therefore unrestricted Sankirtan would be impossible. Plaintiffs were further advised that they could lease a booth for this purpose and practice Sankirtan with no restrictions other than that their solicitations take place within four feet of the booth. Such booths could be leased as long as booths remained available. Defendants did not at any time question the nature or purpose of the Krishna Consciousness religion or the ritual of Sankirtan. No attempt was made to require the submission of any matter to Expo for prior approval. Plaintiffs were offered a booth on the same terms and conditions as any other organization or prospective exhibitor.

12. In these negotiations, plaintiffs took the position that the exercise of Sankirtan required unrestricted access to areas of the fairgrounds open to the public. They subsequently indicated that they would be willing to lease booth space, but only on the condition that they be granted the right to engage in unrestricted Sankirtan. At no time did plaintiffs specifically request booth space at the fair.

13. Pending the outcome of this litigation, plaintiffs are voluntarily restraining from engaging in Sankirtan on the fairgrounds. Defendants are voluntarily reserving one booth for plaintiffs' use, should they decide to lease one, in one of the main exposition buildings on the fairgrounds. Defendant Stackhouse testified that a minimum of 300,000–500,000 persons would visit this building during the fair.

14. Defendants have indicated before this Court their unequivocal intent to avail themselves of whatever means are necessary, including criminal prosecution, to halt any exercise of roving solicitation on the fairgrounds. At the time of the hearing, defendants were unable to specify what form this preventive action would take.

15. The primary purposes of the Ohio State Fair are twofold: First, it constitutes the state's major annual agricultural and industrial exposition. Second, its broadly developed junior program offers educational activities, healthful competition, and recognition for the achievements of Ohio's youth.

16. In furtherance of these twin goals the fair annually offers in excess of 30,000 exhibitions with over 1000 exhibitors renting booth space for a plethora of commercial and noncommercial purposes.

17. More than two million persons attended the Ohio State Fair in 1976. The 1977 Fair is expected to aggregate somewhere between 2.4 and 2.7 million visitors. Exclusive of parking facilities, the fairgrounds encompass some 70 acres.

18. Within the fairgrounds there are in excess of fifty separate buildings housing exhibits, booth space, and storage and display facilities. The major buildings are visited by hundreds of thousands of people in the course of the twelve day fair.

19. The large number of visitors, buildings, and booths has resulted in severe congestion in certain thoroughfares at certain hours. Expo has therefore restricted or eliminated vehicular access to certain pedestrian areas during certain hours. In many locations only emergency vehicles are permitted access.

20. Some twenty percent of the organizations leasing booth space at the fair are leasing the space for other than commercial purposes. Among these groups are eight religious groups. There is no suggestion that any of these groups actually intended to practice their religion, however.

21. The regulations proscribing roving solicitation at county fairs were adopted by the Department of Agriculture over twenty years ago. The initial purpose for enacting them was to regulate the use of county fairs for soliciting signatures on political petitions and for conducting political campaign activities.

22. The regulations against roving solicitations were reconsidered by Expo at a special meeting convened on August 15 but the policy was reaffirmed by a vote of 10–0.

23. Defendants are and have at all times been willing to grant plaintiffs access to the fairgrounds as exhibitors on the condition they lease booth space and comply with applicable regulations. Defendants have at no time sought to prevent devotees of the Krishna Consciousness Religion from entering the fairgrounds as regular fairgoers.

*Discussion*

Plaintiffs in this proceeding are seeking declaratory and affirmative relief from this Court to enable them to proselytize their religious beliefs at the Ohio State Fair. The Ohio Expositions Commission, which by statute is charged with the operation of the fair, has informed them that applicable regulations prohibit such activity unless it is confined to a booth made available for rental and to the area immediately surrounding the booth. It is conceded that there is no invidious or discriminatory purpose behind defendants' refusal to permit roving solicitation by the plaintiffs. It results simply from a regulation adopted in the apparent belief that limiting exhibitors' activities to a leased booth and adjacent areas represents the best possible means of accommodating the interests of all parties wishing to communicate various messages at the State Fair. Plaintiffs contend that the exercise

of their religion requires roving solicitations, known as Sankirtan, although they concede that the state is entitled to make certain carefully restricted regulations governing the time, place, and manner of such solicitations. They assert that a blanket regulation barring roving solicitations is not a constitutionally proper time, place, and manner regulation and that it denies them their constitutional rights to free speech, assembly, and the free exercise of their religious beliefs. For the reasons set forth below, this Court has concluded that the regulations represent the best available means of accommodating conflicting individual and societal interests and that injunctive and declaratory relief is therefore inappropriate. It is incumbent on this Court, however, briefly to consider two preliminary issues which received only perfunctory consideration from the parties.

## I

█ Plaintiffs have brought this action pursuant to Title 42, United States Code, Section 1983, which provides:

Every person who, under color of any statute, ordinance, regulation . . . of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ..

Defendant has conceded that it was operating under color of state law. For purposes of clarification it should be reiterated that the Ohio Expositions Commission is a creature of Ohio statutes. The stipulated facts indicate that some twelve percent of its annual budget takes the form of a direct subsidy from the Ohio General Assembly. This Court therefore concurs in the suggestion that there is sufficient state action here to support a claim under Section 1983. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Farmer v. Moses,* 232 F.Supp. 154, 158–60 (S.D.N.Y.1964).

## II

None of the parties has suggested the doctrine of equitable restraint as a possible limitation on this Court's ability to grant the desired relief. Although the affirmative nature of the relief sought here and facial absence of any pending state proceeding suggest that the doctrine may well be distinguishable, the close connection between Expo and the State of Ohio and the clear intent of the defendants to prevent roving solicitation by whatever means possible have persuaded this Court to devote at least brief consideration to the applicability of the doctrine. Recent Supreme Court decisions casting doubt on the continuing validity of an earlier exception for actions brought pursuant to Section 1983, *see Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), support this decision. *See Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

The absence of a pending state proceeding of course critically affects the equitable restraint calculus. Not only are the equity, comity and federalism considerations of the *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), line of cases inapposite, but plaintiffs here are placed in a situation akin to having to decide "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [they believe] to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974). In *Steffel* the Supreme Court held that federal declaratory relief would be available where there was no pending state proceeding if the plaintiff could demonstrate a genuine threat of enforcement of a disputed state criminal statute. The availability of injunctive relief was not considered, petitioner having abandoned that form of relief in light of a lower court finding that there had been no irreparable injury.

The instant circumstances evidence a genuine threat of enforcement, although

defendants claim the speed with which this matter has come to issue has precluded their knowing the exact nature of their response. They have unequivocally stated, however, that it is their intention to utilize whatever means are available to prevent plaintiffs from engaging in roving solicitations. This Court recognizes that such uncertainty poses the danger that it will be rendering an advisory opinion. *See United Public Workers of America v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Nevertheless, the Court concludes that the definiteness of defendants' intent coupled with the fact that plaintiffs have refrained from exercising their constitutional rights only in order that this matter might be adjudicated in this court indicates a sufficient threat to plaintiffs' rights to satisfy the *Steffel* prerequisites. *See also Adler v. Board of Education*, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952), *overruled in part on other grounds, Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

▮▮ That the threatened harm is irreparable is not open to serious contention. Plaintiffs' exercise of Sankirtan is protected First Amendment activity. "[S]preading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types." *Murdock v. Pennsylvania*, 319 U.S. 105, 110, 63 S.Ct. 870, 873, 87 L.Ed. 1292 (1943). An allegation that defendants' activities are having a chilling effect on plaintiffs' exercise of protected First Amendment activity is generally sufficient to make a prima facie showing of

irreparable harm. *See Dombrowski v. Pfister*, 380 U.S. 479, 485–89, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).[1] And the availability of other places in which plaintiffs may practice Sankirtan will not excuse an interference with those rights where it is found. *See Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *cf. Lehman v. City of Shaker Hts.*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Accordingly, this Court concludes that the prerequisites to an exercise of federal equitable intervention have been established. It is therefore proper to turn to the merits.

### III

Plaintiffs have claimed that defendants' regulations infringe on their First Amendment rights of free speech, free assembly, and free exercise of religious beliefs. Much of the discussion at trial and in the memoranda which the parties have filed with this Court has centered on the free exercise aspect of the claim. This, of course, results from plaintiffs' characterization of the Sankirtan as a duty imposed by the Hare Krishna religion upon its devotees. *Plaintiffs' Memorandum in Support of Application for Temporary Restraining Order*, at 12. There is no factual predicate underlying this interpretation, but for the purposes of this proceeding the Court will assume its verity. But despite the parties' predisposition toward a free exercise analysis, this Court concludes that the claim raises essentially free speech issues.

---

1. There are facts in the record which would suggest a possible refutation of the irreparable injury claim. The booth facilities offered by defendants and held open pending this decision were estimated at the hearing to attract a minimum of 300,000 to 500,000 visitors over the duration of the fair. Plaintiffs in their motion for a temporary restraining order indicated they would accept a restriction limiting the exercise of Sankirtan to twenty-five devotees at any one time during the operating hours of the fair. Assuming that each of these persons can approach an average of two persons per min-

ute, it is clear that plaintiffs' proselytizing would involve at most 36,000 persons in a twelve hour period, or 432,000 persons over the course of the fair. Since plaintiffs would have had access to this many persons under the defendants' restrictions, it could be argued that there is no injury here at all. Defendants did not develop this line of reasoning at trial, however, and this Court is reluctant, in light of the traditional support given to First Amendment claims and the incomplete facts available, to make the argument for them.

The major reason for this, of course, is that the record is entirely devoid of any evidence suggesting that religion was a factor in defendants' enforcement decision. The parties have stipulated that the bona fides of Krishna Consciousness devotees' religious beliefs are not at issue. It is also apparent from the facts as this Court has found them that defendants have been and remain perfectly willing to lease space to plaintiffs on the same conditions required of other exhibitors, that defendants showed no interest whatever in the content of plaintiffs' intended communication, and that in fact space has been leased to eight other religious organizations for noncommercial purposes.

Moreover, plaintiffs themselves have conceded that the solicitations which they seek to perform may be subjected to reasonable time, place and manner restrictions. *Id.* at 10. This concession simply underscores what is already intuitively obvious: what is being regulated here is Hare Krishna devotees' religious conduct and not their religious belief. The distinction is a significant one. "[T]he freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions." *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 1446, 6 L.Ed.2d 563 (1961). Where religious conduct conflicts with an important societal interest, a delicate balancing is in order and it is not at all foreordained that the rights of the individual will prevail. *See, e. g., Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878).

The nature of this balancing suggests that in evaluating the validity of defendants' regulations, this Court may regard plaintiffs' free speech and free exercise rights as constitutional equals. The free speech rights endangered by defendants' conduct are at least as deserving of this Court's protection as the free exercise rights, and any societal interest deemed sufficiently compelling to require a restriction on those free speech rights will also require—and for the same reasons—a restriction on Krishna devotees' free exercise of Sankirtan.

Plaintiffs' free assembly claims may also be subsumed under their free speech claims. Indeed, the independent stature of these claims is far less supportable. Plaintiffs treat the free assembly issue as implicated by the simple fact that two or more people are necessary to an effective communication of ideas. Without wishing to split constitutional hairs, the Court notes that defendants have made no attempt to restrict plaintiffs' rights to organize or to petition for redress. Since the First Amendment's free speech protection encompasses not only the right to speak but also, within reasonable limits, the right to communicate, *see Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the free assembly claims raised here will be governed by the same considerations as the free speech claims and need not receive independent analysis.

Concluding that the crux of the claim presented here is an alleged infringement of freedom of speech narrows the analysis but not sufficiently so. "[W]e should first set to one side decisions which are apt to mislead rather than assist." *Niemotko v. Maryland*, 340 U.S. 268, 276, 71 S.Ct. 325, 330, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring). And substantial free speech precedent must be rejected as turning on factual circumstances not present here.

Thus, it is clear that this case will not turn on a finding that officials have been vested with too much discretion in ascertaining whether Krishna devotees' exercise of Sankirtan is permissible. *See, e. g., Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 617, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Here, the fair officials have no discretion whatever to decide who receives a booth. From the record it appears that chronological order of application is the

only criterion which may be considered. And it is clear that the roving solicitation regulation admitted of no such discretion in either its language or its application.

This is also not a case where discrimination in treatment resulted from the content of the speaker's communication. *See, e.g., Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Defendants made no attempt to ascertain the nature of Sankirtan prior to offering the booth, and there is no indication that the roving solicitation regulation would be enforced differently against Hare Krishna devotees.[2]

█ For the same reason, there is no indication that an issue of prior restraint is raised here. Admittedly, plaintiffs have vehemently asserted that the booth rental requirement constitutes a form of prior restraint. Since a fee is assessed for the rental, plaintiffs charge that a tax is being placed on their exercise of a constitutional right.[3] But plaintiffs misconstrue the import of *Murdock v. Pennsylvania, supra,* which they cite for the proposition that such levies are unconstitutional. *Murdock* specifically exempted nominal fees imposed to defray the expenses of policing the exercise of protected rights. 319 U.S. at 113–14, 63 S.Ct. 870. The facts here suggest that the function of the rental fee is strictly to defray such expenses. Expo is a nonprofit corporation whose operations budget is derived largely from admissions fees and rental fees which it charges. From these assessments must come funds for protective and support personnel, sanitation, litter collection, and other expenditures which are directly related to the exercise of protected rights. This Court therefore concludes that booth rental fees fall within the exception provided in *Murdock.*

█ Finally, plaintiffs' claim does not raise the issue of whether the Ohio State Fairgrounds constitute a public forum. *See, e.g., Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714 (1974); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). Defendants have clearly indicated that they did not oppose plaintiffs' claim on these grounds. *Memorandum in Opposition to Plaintiffs' Complaint for Declaratory and Injunctive Relief,* at 2. And, indeed, the proposition is not open to serious contention. If a school, which has a clearly defined purpose independent though not exclusive of personal intercommunication among students, constitutes a public forum for First Amendment purposes, *Tinker v. Des Moines Independent Community School District, supra,* then it may be inferred that a public fairground is at least equally available for the exercise of protected activity. *Cf. Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

Defendants have briefly suggested that although the fairgrounds as a whole constitute a public forum, the grandstand area might fall within the "captive audience" exception. *Lehman v. City of Shaker Heights, supra.* This Court has not found it necessary to consider that question, however, because plaintiffs have indicated that they have no intention of carrying out their proselytizing within the confines of the grandstand. They raised the issue of grandstand solicitations only to support their contention that Regulation 901–7–22 was overbroad. This elimination of the free speech issues which are inapposite brings the issues presented by this case into sharp relief. The first is whether the roving solicitation restriction may properly be enforced against the plaintiffs at all. The second is whether the restriction in its present form is a constitutionally permissible limitation on First Amendment activity.

---

2. Defendants' decision to keep a booth available for plaintiffs during the pendency of this litigation does not affect this conclusion, since it resulted from good faith efforts of the parties to maintain the status quo, and not from any discriminatory intent.

3. This is to be distinguished from the solicitor's license fee, which the parties have stipulated would be waived.

## IV

The first issue is one of procedural due process. Plaintiffs correctly point out that the regulations promulgated by the Department of Agriculture apply by their terms to county and independent agricultural societies and not to the Ohio Expositions Commission or the Ohio State Fair. *Compare* Ohio Rev.Code §§ 1711.01, 1711.02, 1711.11 (Page 1964 and 1976 Supp.) *with* Ohio Rev. Code §§ 991.01, 991.03 (Page 1968 and 1976 Supp.). *See also* Department of Agriculture Reg. 901–5–01, formerly known as Reg. AG–3–01.01. Although there was uncontradicted testimony to the effect that Expo adheres to the regulations prohibiting roving solicitation, defendants were unable to locate any resolution by which they were formally adopted. Plaintiffs therefore contend that in the absence of applicable municipal ordinances (none have been cited to this Court) the enforcement of these regulations is an unconstitutional exercise of authority.

The answer to plaintiffs' argument must necessarily depend on the type of corrective and/or punitive measures used to compel adherence to the regulations' dictates. Defendants were unable to enlighten the Court at trial concerning the form these measures would take. If they are civil, such as expulsion from the fairgrounds, this Court sees little constitutional difficulty, particularly if such roving solicitors are initially warned that further solicitation will lead to expulsion or similar action. So long as there is no discriminatory application of the rule—a problem not presented here—such enforcement power would fall within the power of Expo to maintain and manage the fairgrounds. *See* Ohio Rev.Code § 991.03(A)(2) (Page 1968).[4]

If, on the other hand, Expo should seek to charge roving solicitors with criminal violations, then there might well be severe notice (i.e., due process) problems. This question is not presently ripe for adjudication, however. The Court therefore concludes that the failure of Expo formally to adopt Regulations 901–7–06 and 901–7–22 does not of itself preclude enforcement of those regulations, although the manner of enforcement could raise other constitutional problems.

## V

Plaintiffs' main attack is directed to the constitutionality of the roving solicitation regulations themselves. Such an attack is commonly mounted on one of two grounds. On the one hand, a statute may be unconstitutionally vague. That is, its language may be so ambiguous that it leaves a reasonable person uncertain "as to what the State commands or forbids." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). *See also Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620–23, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Grayned v. City of Rockford,* 408 U.S. 104, 108–14, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). On the other hand, a statute may regulate too much and in its zeal to protect certain legitimate interests infringe on protected conduct. Under such circumstances the statute is considered overbroad. *See, e.g., Grayned v. City of Rockford, supra,* 408 U.S. at 114–21, 92 S.Ct. 2294; *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

The regulations at issue here are not defective for vagueness. Plaintiffs do not attack them on these grounds, and an analysis of the regulatory language does not reveal wording with uncertain or ambiguous meaning. A person of reasonable intelligence is not required to guess at the language in order to steer between lawful and unlawful conduct. Nor does it offer officials any discretion in determining whether conduct is proscribed.

---

4. A fairgoer's ticket of admission is essentially a contract between the fairgoer and Expo. An implied condition of admission is that it may be revoked for failure to adhere to reasonable regulations governing conduct, and there is no constitutional requirement that these have been formally adopted.

■ Plaintiffs do, however, vehemently assert that the regulations are over-broad. The question is a close one. "The Constitution is not unmindful of other important interests, such as public order, if interference with free expression of ideas is not found to be the overbalancing consideration." *Niemotko v. Maryland,* 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring). Here the facts suggest that there are over 1000 exhibitors seeking to communicate various information.[5] Some form of time, place, and manner restriction is clearly required if the free speech rights of each of these exhibitors are to be protected. In addition, the public has a right of access to the several communications which must be protected as well.

In his concurring opinion in *Niemotko v. Maryland, supra,* Justice Frankfurter suggested that the following four factors have dictated the outcome in decisions considering the constitutional permissibility of time, place and manner restrictions:

1. What is the interest deemed to require the regulation of speech?
2. What is the method used to achieve such ends as a consequence of which public speech is constrained or barred?
3. What mode of speech is regulated?
4. Where does the speaking which is regulated take place?

*Id.* at 282, 71 S.Ct. at 333. *See also Lehman v. City of Shaker Heights, supra,* 418 U.S. at 302–03, 94 S.Ct. 2714; *Grayned v. City of Rockford, supra,* 408 U.S. at 116, 92 S.Ct. 2294. Consideration of these factors in the present context compels the conclusion that Expo's regulations are constitutionally proper.

The interest underlying the restriction of solicitation to rented booths has already been briefly mentioned. The constitutional right of over 1000 exhibitors to communicate with one or more of an average of

175,000 visitors daily in an area of 70 acres and the traffic congestion which could be envisioned if untrammeled free speech were permitted both compel some form of regulation. *See Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (right to impose nondiscriminatory free speech restrictions in the context of regulating travel on streets recognized); *Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (regulation permitted to accommodate different groups seeking to exercise same right). A third factor—the problem of litter—has been repeatedly raised by the defendants but has been given no weight by this Court. *See generally Schneider v. State,* 308 U.S. 147, 162, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

The method which has been adopted by Expo is a system of booths available for rental to prospective exhibitors on a nondiscriminatory basis and without regard to the content of the exhibitor's message (there are certain statutory restrictions not relevant here). Exhibitors are permitted to work within a restricted space around their individual concessions as well. This method guarantees each exhibitor a specific area where he is free from interference from other exhibitors and where he may communicate his message to passersby without interruption. At the same time, by restricting exhibitors to the immediate area of their booths, and then locating those booths outside of major thoroughfares, the general interest in protecting the free flow of traffic and providing untrammeled access to specific areas is advanced. Although a fee is charged for the rental of this booth space, this Court has already determined that such a fee is not constitutionally improper since its purpose is simply to defray expenses resulting from the exhibitors' activities.

The mode of speech being regulated here is solicitation. While it is perhaps not an exercise of free speech rights "in their most pristine and classic form," *Edwards v.*

---

5. The fact that eighty percent of these exhibitors are communicating information of a commercial nature is no longer of constitutional significance. *See Virginia State Board of Phar-* *macy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761–70, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

*South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963), it stands high in the constitutional hierarchy. Only "silent speech" is deserving of more protection. *See Tinker v. Des Moines Independent Community School District, supra.*

Finally, the speaking which is to be regulated would take place on fairgrounds whose primary purpose for the duration of the fair is to house an agricultural and industrial exposition and to support educational and competitive junior activities. At this time the fairgrounds are not on a constitutional plane with an open-air park or street corner "immemorially . . . held in trust for the use of the public, and, time out of mind, . . . used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Nor can a strong parallel be drawn between the Ohio State Fair and a facility in which the intercommunication of ideas is an important aspect of the process to which the facility is dedicated. *See generally Tinker v. Des Moines Independent Community School District, supra.*

Balancing all of these factors, this Court concludes that the system of rental booths adopted by the Ohio Expositions Commission offers the best available means of accommodating the conflicting interests of the exhibitors in free speech, the fairgoers in access to communicated material, all fair participants in a minimum of congestion on major thoroughfares at the fairgrounds, and the people of the State of Ohio in an annual exposition of their agricultural and industrial achievements and in educational, competitive, and recognitional programs for youth. Accordingly, the Court finds that plaintiffs have not sustained their burden of establishing their right to injunctive relief.

### Conclusions of Law

1. There is sufficient state action present here to support a colorable claim under Title 42, United States Code, Section 1983.

2. This Court has jurisdiction over this action by virtue of Title 28, United States Code, Section 1343(3).

3. This Court is not precluded from considering plaintiffs' claims by the doctrine of equitable restraint.

4. Plaintiffs' claims based on threatened infringement of their First Amendment right to free exercise of their religion are, under the facts of this case, governed by considerations applicable to their free speech claims as well. This Court has considered the two simultaneously from the perspective of free speech.

5. Plaintiffs' claims based on threatened infringement of their First Amendment free assembly rights raise the same issues as their free speech claims under the circumstances of this case. Accordingly, this Court has considered both aspects simultaneously from the perspective of free speech.

6. The apparent failure of the Ohio Expositions Commission formally to adopt the regulations of the Ohio Department of Agriculture governing county fairs for the conduct of the Ohio State Fair does not affect its right to enforce those regulations by civil means where, as here, the enforcement is carried out in an evenhanded manner. This Court does not consider whether enforcement of such regulations by criminal prosecution would be constitutionally proper.

7. Regulations 901–7–06 and 901–7–22 of the Ohio Department of Agriculture are not unconstitutionally vague.

8. Regulations 901–7–06 and 901–7–22 of the Ohio Department of Agriculture are not unconstitutionally overbroad as applied to the Ohio State Fair and in the context of a requirement that all prospective exhibitors lease booth space.

WHEREUPON, It is the determination of this Court that plaintiffs have failed to establish their right to declaratory or injunctive relief and that JUDGMENT be and it is hereby rendered in favor of the defendants on the claims set forth in plaintiffs' complaint.