Harry SMITH et al.

v.

Dawn SMITH et al.

Civ. A. No. 74-116.

United States District Court,
W. D. Virginia,
Harrisonburg Division.

March 14, 1975.

Robert P. Dwoskin, Charlottesville, Va., for plaintiffs.

Phillip C. Stone, Glenn M. Hodge, Harrisonburg, Va., for defendants.

## OPINION

TURK, Chief Judge.

This case presents the question of whether the participation of the Harrisonburg public schools in a program whereby students are released from school for the purpose of attending religious instruction classes violates the First Amendment of the United States Constitution as incorporated by the Fourteenth Amendment. The named plaintiffs are residents and taxpayers of the City of Harrisonburg, Virginia whose children are now, have in the past, or will be attending public schools in Harrisonburg which participate in the "release time" program here challenged as unconstitutional.

The operative facts are not significantly in dispute and the court finds them to be as follows: Weekday Religious Education Program (WRE) is a non-profit association supported by the Virginia Council of Churches which seeks to provide religious instruction to children in Harrisonburg. The program began in 1923 with the religious instruction taking place in the school classrooms; however in 1963 WRE began using a trailer parked on the street adjacent to the schools or a nearby church as a classroom. Presently, the program is operated in three elementary schools in Harrisonburg; at two of the schools children in grades 3 through 5 participate and in other school the participating children are in grades 2 through 4.

WRE obtains a list of the students in the participating grades from the schools and from these lists mails cards to the parents of the children asking them if they consent to their child's participation in the program. The cards are then deposited by the children in a box in the classroom and are eventually picked up by WRE. WRE thereafter notifies the schools as to which children have parental permission to attend the religious instruction classes. A notation is made by school officials in the student's file indicating whether the child has permission to be absent during the release time period. WRE personnel are not permitted to enter the schools to solicit children to participate in the program. Employees of the public schools do not distribute the parental consent cards or assume responsibility for their return; and they are not permitted to encourage the children either directly or indirectly to participate in the program.[1] Even if parental consent is given, a child who does not want to attend the WRE classes is not compelled to do so.

At two of the elementary schools a mobile trailer owned by WRE is parked on a public street next to the school when class is held. The trailer is not allowed to be parked on school property. At the third elementary school, the children attend class at a nearby church. Twenty-seven classes of children participate in the program with approximately one hour of instruction per week given to each class. Instruction is given to one class (25 to 30 children) at a time, and the principals of the individual schools integrate the WRE classes into the regular classroom scheduling, with different classes being released throughout the school day during the week. Those students who do not attend WRE classes remain in class under the supervision of a teacher although they do not receive formal instruction and do not work on their lessons. The evidence indicated that during WRE instruction the non-participating students do things such as helping the teacher grade papers, cleaning the blackboard and entertaining themselves.

---

1. Plaintiffs' evidence indicated that in the past WRE teachers had been permitted to solicit children in the school classrooms and that public school teachers had encouraged the students to attend WRE classes. The court does not disbelieve this evidence, but on the basis of all of the evidence presented finds that these practices are contrary to the policy of the public school system and would not be tolerated if brought to the attention of school officials.

446

Although the Harrisonburg City School Board approves the WRE program in the sense that it allows the schools to schedule organized release time classes as an accommodation to WRE and those members of the community approving of the program, it does not approve or disapprove of the substance of the instruction offered by WRE. The School Board does not make school property or personnel available to WRE and does not directly expend money to assist WRE.

The constitutional issue presented by this case has as its focal point the case of Zorach v. Clauson, 343 U.S. 306, 72 S. Ct. 679, 96 L.Ed. 964 (1952) in which the Supreme Court upheld the constitutionality of a release time program factually similar to that involved in this case. In Zorach the challenged program had been established by New York statute and regulations as supplemented by regulations promulgated by the New York City School Board. Under the program a student was released from school during the school day on the written request of his parents to attend religious instruction classes or services at churches away from the school grounds with those students not released remaining in the classrooms. The court rejected the claim that the program inhibited the "free exercise" of religion on the basis that there was no evidence that coercion was applied by school authorities to influence students to take religious instruction. With respect to the claim that the program amounted to an unconstitutional "establishment of religion," the court distinguished McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) which held unconstitutional on "establishment" grounds an Illinois release time program in which the religious instruction actually took place in the school classrooms.

■ The plaintiffs herein challenge the Harrisonburg program on both "establishment" and "free exercise" grounds, but as in Zorach, this court perceives the substantial constitutional issue presented to be whether this particular program amounts to an "establishment" of religion. The court is of the opinion that plaintiffs' contention that the administration of the program prohibits their free exercise of religion is simply not supported by the facts.

■ There can be little doubt that the decision in Zorach is a strong precedent in favor of the constitutionality of the Harrisonburg program, for the conclusion is inescapable that at least since 1963 when WRE began using a mobile trailer and a local church for a classroom, the School Board and WRE have sought to come within the constitutional constraints of that decision. Although Zorach is factually similar to the present case, there are distinctions which are of some significance which will be discussed below. But, aside from factual distinctions, this court does not believe that Zorach is necessarily dispositive of the present case. This court must, of course, follow the decisions of the Supreme Court, but much has been written by the Court concerning the "establishment of religion" since the decision in Zorach; and, "there are occasional situations in which subsequent Supreme Court opinions have so eroded an older case, without explicitly overruling it, as to warrant a subordinate court in pursuing what it conceives to be a clearly defined new lead from the Supreme Court to a conclusion inconsistent with an older Supreme Court case." Rowe v. Peyton, 383 F.2d 709, 714 (4th Cir. 1967), aff'd, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 420 (1968). Accord, Perkins v. Endicott Johnson Corp., 128 F.2d 208, 217 (2nd Cir. 1942), aff'd, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943); Healy v. Edwards, 363 F.Supp. 1110 (E.D.La.1973), probable jurisdiction noted, 415 U.S. 911, 94 S.Ct. 1405, 39 L.Ed.2d 465 (1974); Browder v. Gayle, 142 F.Supp. 707 (M.D.Ala.), aff'd, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); Barnette v. West Virginia State Board of Education, 47 F.Supp.

251 (S.D.Va.1942), aff'd, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).[2]

In several cases subsequent to *Zorach* the Supreme Court has faced the problem of determining whether particular government programs affecting religious institutions unconstitutionally breached the wall of separation between church and state. In the face of establishment clause challenges the court has upheld Sunday Closing Laws, McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); the loaning of books on secular subjects to students attending sectarian schools, Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); state property tax exemptions for religious organizations, Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); and federal construction grants to church-related colleges and universities provided that the facilities not be used for sectarian instruction or religious worship, Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).[3] On the other hand, the court has held unconstitutional under the Establishment Clause state programs requiring Bible readings and recitation of the Lord's Prayer in public schools, Abington School District v. Schempp,

374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); recitation of a nondenominational state prayer in the public schools, Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); an Arkansas statute prohibiting the teaching of evolution in public schools, Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); and state programs providing supplements to teacher's salaries, textbooks and instructional materials for secular services rendered by religious schools, Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); and state programs providing public grants for maintenance and repair to sectarian schools and tuition reimbursement and tax deductions to the parents of children attending such schools, Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

In Walz v. Tax Commission, *supra,* the court discussed the difficulty in finding a neutral course which would accommodate both the "free exercise" and "establishment" clauses of the First Amendment and was frank in pointing out the "internal inconsistency in the opinions of the Court . . . ." 397 U.S. at 668,

---

2. In *Barnette* Judge Parker of the Fourth Circuit in declining to follow the decision in Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940) stated for a three-judge district court:

"Ordinarily we would feel constrained to follow an unreversed decision of the Supreme Court of the United States, whether we agreed with it or not. It is true that decisions are but evidences of the law and not the law itself; but the decisions of the Supreme Court must be accepted by the lower courts as binding upon them if any orderly administration of justice is to be attained. The developments with respect to the Gobitis case, however, are such that we do not feel that it is incumbent upon us to accept it as binding authority. Of the seven justices now members of the Supreme Court who participated in that decision, four have given public expression to the view that it is unsound, the present Chief Justice in his dissenting opinion rendered therein and three other justices in a special

dissenting opinion in Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 1251, 86 L.Ed. 1691. The majority of the court in Jones v. City of Opelika, moreover, thought it worthwhile to distinguish the decision in the Gobitis case, instead of relying upon it as supporting authority. Under such circumstances and believing, as we do, that the flag salute here required is violative of religious liberty when required of persons holding the religious views of plaintiffs, we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guarantees." 47 F.Supp. at 252–253.

3. In *Tilton* the court did reject as unconstitutional a clause in the federal statute which allowed the condition that the facility not be used for sectarian purposes to expire after twenty years.

90 S.Ct. at 1411. The court went on to state with respect to its earlier decisions:

"The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." 397 U. S. at 669, 90 S.Ct. at 1411.

■ The following year in Lemon v. Kurtzman, *supra,* the court was even more explicit in defining the judicial criteria to be applied in judging whether a particular government program breaches the constitutional wall between church and state:

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' Walz, *supra,* at 674, 90 S.Ct. 1409, at 1414." 403 U.S. at 612–613, 91 S.Ct. at 2111.

This tripartite test which was subsequently described as "a product of considerations derived from the full sweep of the Establishment Clause cases", Committee For Public Education v. Nyquist, *supra,* 413 U.S. at 772, 93 S.Ct. at 2965, provides the governing standards to be applied to the case at bar.

The purpose of the Harrisonburg public school system's participation in the WRE release-time program is that of accommodating parents, students and the community. As stated by the Superintendent of the Harrisonburg public schools in his affidavit, "[t]he Harrisonburg public schools will seek to accommodate any individual or group which has the written consent of parents or children so long as the release can be done in an orderly manner not unduly disruptive to the educational process." The public school system does not approve or review the materials or instruction offered by WRE and offers no financial assistance to it. Thus, in the defendants' view, the secular purpose of the service provided by the schools to WRE is merely that of accommodating parents in the community and is no different than that afforded any parent who desires to have his child excused from school temporarily for any of a variety of reasons. The court can accept defendants' stated secular purpose of the program as legitimate. The court finds that the *intent* of the public school officials in integrating WRE classes into the schools' schedules is neither "the advancement or inhibition of religion," Abington School District v. Schempp, *supra* 374 U.S. at 222, 83 S.Ct. at 1571, but rather, is simply to accommodate certain parents and their children who approve of the program.

■ Secondly, the principal or primary effect of the program must also neither advance nor inhibit religion, and it is in this respect that the court finds that the WRE program fails to satisfy constitutional standards. It is clear that WRE is dependent on the public schools for its success in providing religious instruction to a large number of young children in the community. Without the active participation of the public schools in the form of scheduling WRE classes throughout the school day and supervis-

ing those students who do not participate, WRE's mission would undoubtedly not reach the quantity of students that it now does. Nor would the quality of the program in the eyes of the children be the same, for as the program now exists the WRE classes are distinguishable from the regular secular classes only in that they are conducted in a trailer next to the school or a nearby church by a different teacher; but these distinctions would seemingly make little or no substantive impression on the elementary school childern involved in the program. The cooperation of the public schools in administering the WRE program can hardly help but create an impression of an indorsement of the program and in so doing obscure any distinction between the religious and secular classes and teachers. *See* Abington School District v. Schempp, *supra* at 261–263, 83 S.Ct. 1560 (1963) (Brennan, J. concurring). In this regard, the fact that the WRE program is directed toward elementary school children in grades two through five as opposed to older more discriminating students is a significant factor in terms of WRE's mission, and the assistance it receives from the public schools in achieving its purpose. See Tilton v. Richardson, *supra* 403 U.S. at 685–686, 91 S.Ct. 2091. It is this "sponsorship" and "active involvement," Walz v. Tax Commission, *supra* 397 U.S. at 668, 90 S.Ct. 1409 in the form of the schools' scheduling of WRE classes which has the principal or primary effect of advancing the religious instruction offered by WRE and hence brings the program into conflict with the Establishment Clause of the Constitution.

This degree of cooperation between WRE and the Harrisonburg public schools may also serve to distinguish *Zorach*, assuming that decision remains a viable precedent despite the analysis adopted by the court in Lemon v. Kurtzman, *supra*, and its progeny. Under the program considered in *Zorach* the students were released "to religious centers for religious instruction or devotional exercises." The obvious factual distinction in the case at bar is that in Harrisonburg the children at two of the schools are released to a mobile trailer parked adjacent to the school.[4] As noted above, the proximity of the trailer to the school and the integration of WRE classes with secular classes is significant in that the separation between the secular and the religious classes and the authority of the teachers of each is diminished. However, of greater significance in distinguishing *Zorach* is the fact that WRE, as an organization with a religious purpose, is dependent on the active cooperation and accommodation of the public schools. Such an interrelationship did not appear to exist between one organization and the public school system in *Zorach*. Although the Court in *Zorach* distinguished its earlier decision in *McCollum* on the basis that school property was not used for religious education under the New York program and "the public schools [did] no more than accommodate their schedules to a program of outside religious instruction", 343 U. S. at 315, 72 S.Ct. at 684, the court also stated that "[t]he problem, like many problems in constitutional law is one of degree." 343 U.S. at 314, 72 S.Ct. at 684. Thus, the Court cannot assess the constitutionality of this particular release time program by blind generalizations. As stated in the recent case of Lemon v. Kurtzman, *supra* 403 U.S. at 614, 91 S.Ct. at 2112, "Judicial caveats against

4. Plaintiffs' counsel has submitted additional information regarding the program considered in *Zorach* in an attempt to distinguish that case from the present case. This information indicates that under the New York City program considered in *Zorach* the students were released for religious instruction during the last hour of the school day. This would indicate that there was a lesser degree of interrelationship between the secular and religious instruction under the New York program than in the Harrisonburg situation. However, the Supreme Court made no mention of this factor in its decision in *Zorach*, and this court accordingly considers it to be irrelevant as a basis for distinguishing *Zorach*.

entanglement must recognize that the line of separation, [between church and state] far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.[5]

The fact that WRE is apparently the only organization offering religious instruction by means of a release time program in the public schools in Harrisonburg, and over the years has established a close working relationship with the public school system upon which it depends in order to achieve its purpose presents a greater degree of involvement between church and state than that stated in *Zorach*. However, this court realizes that *Zorach* is not readily distinguishable, and prefers to base its legal conclusions in the present case on the fact that the Harrisonburg program fails to withstand the constitutional analysis adopted by the Supreme Court subsequent to its decision in *Zorach*, and specifically the standard which considers "the principal or primary effect" of the government involvement. As stated above, the Harrisonburg release time program fails to withstand such an analysis.

Because of its conclusion that the primary effect of the release time program advances WRE's mission, the court need not consider the degree of entanglement between church and state caused by the program. It should be noted though that the involvement of the public schools in this particular case does present constitutional "entanglement" problems at least insofar as there appears to be a substantial potential for political divisiveness based on religious considerations.[6]

Finally, the court feels constrained to comment on the issue of the "free exercise of religion" raised by both sides to this case. As already stated, the court does not find that the release time program operates so as to inhibit the plaintiffs' free exercise of their religion. Defendants, however, contend that those students choosing to participate in the program have a constitutional right to do so. In effect defendants are arguing that to sustain the plaintiffs' Establishment Clause argument would be to infringe the constitutional right of other students and their parents to the free exercise of their religion. This argument cannot be ignored because the right of individuals to freely exercise their religious beliefs is as protected by the Constitution as is the right of individuals to prevent their government from establishing a religion. The defendants' argument in this regard clearly points out

5. In McCollum v. Board of Education, 333 U.S. *supra* at 225, 226, 68 S.Ct. at 472, Mr. Frankfurter also expressed the idea that the specific facts and circumstances surrounding a given release time program must be considered in assessing its constitutionality:

"Of course, 'release time' as a generalized conception, undefined by differentiating particularities, is not an issue for Constitutional adjudication. Local programs differ from each other in many and crucial respects. Some 'release time' classes are under separate denominational auspices, others are conducted jointly by several denominations, often embracing all the religious affiliations of a community. Some classes in religion teach a limited sectarianism; others emphasize democracy, unity and spiritual values not anchored in a particular creed. Insofar as these are manifestations merely of the free exercise of religion, they are quite outside the scope of judicial concern, except insofar as the Court may be called upon to protect the right of religious freedom. It is only when challenge is made to the share that the public schools have in the execution of a particuuar 'released time' program that close judicial scrutiny is demanded of the exact relation between the religious instruction and the public educational system in the specific situation before the court."
"The substantial differences among arrangements lumped together as 'released time' emphasize the importance of detailed analysis of the facts to which the Constitutional test of separation is to be applied."

6. In Lemon v. Kurtzman, *supra* 403 U.S. at 622, 91 S.Ct. at 2116, the court commented with respect to this type of entanglement:

"Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect."

the inherent tension between the Free Exercise and Establishment Clauses of the First Amendment to the Constitution. In Walz v. Tax Commission, *supra,* Mr. Chief Justice Burger commented in this regard:

"The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." 397 U.S. at 668–669, 90 S.Ct. at 1411.

The appeal of defendants' free exercise argument is particularly acute in the present case where the religious education program has been an accepted part of the school curriculum for over fifty years and is obviously popular with an overwhelming majority of the community. However, this long-standing, accepted relationship between WRE and the public schools even more cogently demonstrates how WRE has become an unconstitutional "established" part of the public school system.

██ It is well established that "a violation of the Free Exercise Clause is predicated on coercion", Abington School District v. Schempp, *supra* 374 U.S. at 223, 83 S.Ct. at 1572. It is true, as defendants point out, that the public school system controls much of a student's life between ages five and eighteen; but this court cannot conclude that without a religious instruction period during school hours students or their parents are prevented or coerced in any way from pursuing their religious beliefs. The right of individuals to freely practice their religious beliefs does not encompass the right to use the government to that end. This thought was expressed in Abington School District v. Schempp, *supra,* 374 U.S. at 226, 83 S.Ct. at 1574:

"The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality."

██ On the other hand, a violation of the Establishment Clause "does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." Engel v. Vitale, *supra* 370 U.S. at 430, 82 S.Ct. at 1267. As already stated, the primary effect of the WRE program in the Harrisonburg schools is to advance a particular religious program, and it is for this reason that the Establishment Clause has been violated. In so concluding, this court has admittedly favored the position of a very small minority of the Harrisonburg community over that of the majority, but the very purpose of the religion clauses of the First Amendment was to insure that the sensitive issues of an individual's religious beliefs would be beyond majority control. As stated in Abington School District v. Schempp, *supra* 374 U.S. at 226, 83 S.Ct. at 1573,

"While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to *anyone,* it has never meant that the majority could use the machinery of the State to practice its beliefs. Such a contention was effectively answered by Mr. Justice Jackson for the Court in West Virginia Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943):

'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to . . . freedom of worship . . . and other fundamental rights may not

be submitted to vote; they depend on the outcome of no elections.'" (emphasis in original).

On the basis of the reasons and authority stated, the plaintiffs' prayer for injunctive relief restraining the defendants from further participation in the WRE program described herein will be granted. Plaintiffs' other prayers for relief and for costs and fees will be denied. An order in conformity with the conclusions stated in this opinion will be entered on this day; however, should defendants choose to appeal this judgment, on appropriate motion, this court will stay the effect of its order pending such appeal.

This opinion constitutes the findings of fact and conclusions of law constituting the basis for the granting of injunctive relief as required by Rule 52(a).