**J. DOE, a minor, by his next friend and mother, Martha DOE, et al., Plaintiffs,**

v.

**SHENANDOAH COUNTY SCHOOL BOARD, et al., Defendants,**

**Civ. A. No. 90–0128–H.**

United States District Court, W.D. Virginia, Harrisonburg Division.

May 17, 1990.

---

Sebastian K.D. Graber, American Civ. Liberties Union of Virginia Foundation, Wolftown, Va., and Stephen B. Pershing, American Civ. Liberties Union of Virginia, Richmond, Va., for plaintiffs.

Phillip C. Stone, Douglas L. Guynn, Roy W. Ferguson, Wharton, Aldhizer & Weaver, Harrisonburg, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiffs in this case are a minor child, who is a student in the defendants' schools, and his mother. The defendants are the county school board and several of its employees. Plaintiffs allege that the defendants, their employees, or agents have permitted or engaged in conduct which violates plaintiffs' rights under the Free Exercise and Establishment Clauses of the First Amendment. Plaintiffs bring this action under 42 U.S.C. § 1983. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Plaintiffs have filed a verified complaint which seeks monetary damages as well as injunctive and declaratory relief and attorney's fees. Currently before the court is plaintiffs' motion for a temporary restraining order. A hearing was held on May 11, 1990 at which time the court heard argument from counsel for both parties. Plaintiffs and Defendants have both submitted memoranda. After the hearing the court took plaintiffs' motion under advisement; that motion is now ready for disposition.

I

Plaintiff J. Doe is a third grade student at W.W. Robinson Elementary School in Woodstock, Virginia. Plaintiff Martha Doe is J. Doe's mother.[1] W.W. Robinson Elementary is a public school operated by the defendants which provides instruction to students in kindergarten through grade four. The defendant Shenandoah County School Board (the "Board") is a local governmental agency which operates the public schools in Shenandoah County Virginia. The individual defendants are the Division Superintendent of Schools and the Principal of W.W. Robinson Elementary School.

Weekday Religious Education, Inc. ("WRE") is a private sectarian organization which seeks to indoctrinate young children in the tenets of the Christian Faith. It has operated in Virginia and other states for a substantial period of time. WRE carries out its mission by providing religious education to students who have been released from their regular academic duties during the course of the school day. Prior to 1982 WRE had conducted religious education classes inside the school buildings in Shenandoah County. After being advised of the constitutional infirmity of this practice the Board required WRE to conduct its classes off the school premises.

In response to this WRE commenced using remodelled school buses owned by WRE for classrooms. These buses are in all outward appearances identical to the school buses used by the defendant except

---

1. Plaintiffs in this action are prosecuting this suit under pseudonyms.

that they lack a school system identification on the sides of the bus, have regular license plates as opposed to official municipal plates, and have a sign on the front which states "SHENCO WRE." These buses have been parked at varying locations over time. It is alleged in the verified complaint that the buses have parked in the school parking lot and at different locations on the road passing directly in front of the school entrance. Photographic exhibits tendered by the plaintiffs show the WRE bus parked directly in front of what appears to be the main entrance to the school and only a matter of inches from the curb. The parking of the buses in such proximity to the school is alleged to have occurred over at least a two year period, and from what appears in the record may actually be an eight year period. While any particular group of students is in the bus for only an hour, groups of students rotate in and out over the course of a day with the result that the bus is parked in front of the school for the majority of the school day.

Defendants have submitted various affidavits as well as a resolution of the Board dated May 14, 1990, in support of their opposition to the request for emergency relief. None of these documents denies that the buses have parked in these locations or indicates any intention to prohibit the buses from parking there in the future.

The verified complaint alleges that on at least three occasions in the past WRE religious instructors entered the school building for the purposes of recruiting students. On one of these occasions, when the plaintiff was in the second grade, a WRE instructor entered the plaintiff's classroom, distributed enrollment cards to each of the students, and told the students, while holding up a bag of candy, that each student would receive a prize if all of the cards were returned. When plaintiff failed to return his card, he was subjected to substantial pressure by other students, as well as his teacher, to return the card. In particular, the students were told that they would not get their candy unless all the cards were returned. The WRE instructor made a second visit to the classroom, again with the bag of candy, and told the children

that she had their reward but could not give it to them because some of the children had not returned their cards.

On another occasion the WRE instructor came into the classroom and, without having prior parental permission, removed all of the school children including the plaintiff, and escorted them to the WRE bus parked in the school parking lot. Once on the bus the children were recruited to join the WRE program.

The verified complaint also alleges that public school teachers have assisted the WRE program by passing out and collecting enrollment cards. It also alleges that public school teachers have verbally encouraged both of the plaintiffs to ensure that these cards were completed and returned. It also appears from the complaint that WRE instructors have entered the classrooms at W.W. Robinson to call out the names of enrolled students and escort them to the WRE bus.

The defendants do not deny that these events took place. They offer in response an affidavit stating that their policy forbids at least some of these activities and that to the extent they or their employees violated this policy it would have been corrected had it been brought to their attention. However, when the principal received a letter from the plaintiff's mother regarding the parking of school buses near the school and the visits of the WRE instructors to the classroom, the principal agreed, in his reply letter dated July 5, 1989, that these activities had occurred, while in some instances disputing the precise facts, and that some were "approved" by him. Thus, it appears that such activities do not violate the defendants' policy.

The factual allegations consume some twelve pages of the complaint and the court, at this stage, has made no attempt to set them forth fully. The above recitation is intended to do no more than give a flavor of the situation currently under consideration.

II

The standard this court must use when determining whether to enter a tem-

porary restraining order ("TRO") is the balance-of-hardships test. *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 196 (4th Cir. 1977). The district court may consider four factors: petitioner's likelihood of prevailing on the merits; whether the petitioner will suffer irreparable harm without injunctive relief; whether issuance of such injunctive relief would substantially harm the defendants; and whether the issuance of the injunction is in the public interest. *Id.* at 192, 196. However, the factors of paramount importance which the court must balance are those of harm to the petitioner and harm to the respondent. *Id.* at 196; *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir.1978). As the court made clear in *Blackwelder* and later cases, there is something of a sliding-scale relationship between the harm to the plaintiff and the necessity of showing a likelihood of success on the merits. *Blackwelder*, 550 F.2d at 196; *Johnson*, 586 F.2d at 995. If the balance of harms is struck in favor of the plaintiff "it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." *Id.*

■ Violations of First Amendment rights constitute *per se* irreparable injury. *Johnson*, 586 F.2d at 995. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).[2] This is true even where the impairment exists for only a minimal period of time. *Joyner v. Lancaster*, 553 F.Supp. 809, 815 (M.D.N.C. 1982). *See also, Quaker Action Group v. Hickel*, 421 F.2d 1111, 1116 (D.C.Cir.1969) ("*any* delay in the exercise of First Amendment rights constitutes an irreparable injury," (emphasis added)); *Int'l Soc. for Krishna Consciousness v. Hays*, 438 F.Supp. 1077, 1081 (S.D.Fla.1977) ("it is well established that the denial of First Amendment freedoms even for a day inflicts irreparable injury"). However, even

in light of this, under *Blackwelder* the court must still make some investigation into the plaintiff's likelihood of success in a case such as the present one since the finding of First Amendment violations, and hence irreparable injury, must "depend at a minimum on the probable soundness of the plaintiff's allegations of violation of constitutional rights and not merely on the allegations." *Id. See Delaware & H. Ry. Co. v. United Transportation Union*, 450 F.2d 603, 619–620 (D.C.Cir.), *cert. denied*, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). With these rules in mind the court will analyze the four elements.

■ Assuming for the moment that the plaintiffs' allegations are sound, it is beyond dispute that they will suffer irreparable harm should the court withhold injunctive relief. *Johnson*, 586 F.2d at 995. It is well established that even the most fleeting of infringements upon a citizen's First Amendment rights constitutes irreparable injury that he should not be required to endure. *Joyner*, 553 F.Supp. at 815. The facts alleged in the verified complaint indicate that such infringements have been continuing over a lengthy period of time and that they will continue unless enjoined. Again assuming for the moment the soundness of plaintiffs' allegations, the court is convinced that irreparable harm has occurred and will continue absent equitable relief.

It is equally clear that under the present facts harm to the defendants, should a TRO be granted, will be minimal at best. The defendants are school administrators and not the providers of the weekday religious education; thus, enjoining the activities complained of can have only the smallest impact upon them. The TRO requested by the plaintiffs would only require the defendants to communicate to WRE personnel that they are not allowed to park their bus in close proximity to the school

---

**2.** While *Johnson* and *Elrod* both involved First Amendment rights arising out of the Free Speech clause, that creates no distinction from the present case. Only the most metaphysical could debate which is more important to the basic core of American values, religious freedom or freedom to speak. *See Int'l Soc. for*

*Krishna Consciousness v. Evans*, 440 F.Supp. 414, 420 (S.D.Ohio 1977) ("[p]laintiffs have established irreparable injury by showing the ordinance has prohibited the free exercise of their religious beliefs in violation of the First Amendment").

and that WRE employees are not allowed to enter upon school property. It would also require the defendants to ensure that their employees do not participate in recruitment activities or pressure students. Beyond requiring that information concerning parking and entry into the schools be conveyed to the religious education providers, ensuring that the instructions are complied with, and supervising their own employees the injunction would require nothing more of the defendants. These basically administrative tasks would require no change in the defendants' operations and no expenditure of what are, no doubt, limited financial resources.

Under *Blackwelder* and its progeny the balance of harms between the parties is the paramount factor to be considered by this court. It is hard for this court to conceive of a case where the balance is more lopsided in favor of the moving party than the present one—First Amendment infringements are *de facto* irreparable injury and the burden to be placed upon the defendants is nothing more than providing oral instructions to others and making sure that the instructions are followed. There is no indication that any third party involved would be uncooperative. Harm to the defendants is negligible at best.

As noted above, where the balance of harms favors the plaintiff then a likelihood of prevailing on the merits need not be demonstrated; it is enough that serious questions are presented. However in a case such as this, where irreparable harm is essentially "bootstrapped" into place by the allegations of the complaint, some minimal investigation into the likelihood of prevailing on those allegations may be required since if the alleged actions of the defendants comport with the constitution then no harm has been shown. *Joyner,* 553 F.Supp. at 815.

As with so many matters which touch upon such sensitive parts of the American psyche, the question of weekday religious education programs in the public schools has been faced many times by the federal courts. This court, the Fourth Circuit and the Supreme Court have all wrestled with

aspects of this issue. *See Vaughn v. Reed,* 313 F.Supp. 431 (W.D.Va.1970); *Smith v. Smith,* 523 F.2d 121 (4th Cir.1975) *rev'g* 391 F.Supp. 443 (W.D.Va.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976); *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). And again, like so many troubling problems in constitutional law, the guideposts left by the courts are not always easy to read either individually or collectively. Little would be served at this time by the court's engaging in an in-depth analysis of the applicable law—the prosecution of the case is in its earliest stage, little factual development has taken place, and time is of the essence. Such complete analysis must await a decision on the merits. At this point it is enough that the court determine whether the plaintiffs have some basis for arguing their allegations and consequently the court some basis for concluding that irreparable injury will occur.

As a starting point this court must turn to Fourth Circuit precedent. In *Smith,* the Court of Appeals reversed this court's holding that the WRE program in the public schools in Harrisonburg was unconstitutional. *Smith,* 523 F.2d at 124. In its decision, this court had concluded that although the WRE program in Harrisonburg was "not readily distinguishable" from the program in *Zorach,* the analytical framework of *Zorach* had been weakened by subsequent Supreme Court precedent, in particular the decision in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Smith v. Smith,* 391 F.Supp. 443, 446–448 (W.D.Va.1975). Consequently, this court, in *Smith,* analyzed the facts before it under the tri-partite *Lemon* test and found they failed to pass constitutional muster. *Id.* at 450.

In reversing, the Fourth Circuit reasserted the primacy of *Zorach, Smith,* 523 F.2d at 123–124, and held that since the facts at issue were not distinguishable from those in *Zorach* the latter must control, *id.* at 124. The court did note, however, that were it to decide the case solely under the *Lemon* rule it would "be inclined to agree

with the district court's overall conclusion that the Harrisonburg release-time program is invalid." *Id.* For two reasons this court feels that the present plaintiffs have shown a likelihood of prevailing on the merits. First, the present facts, unlike those in *Smith,* are distinguishable from those in *Zorach* and more closely akin to those in *McCollum* where the court invalidated the program.[3] Secondly, the almost fifteen years since the Fourth Circuit's decision in *Smith* have been marked by repeated statements from the Supreme Court that the *Lemon* test is the one which the courts are to use when examining Establishment Clause questions. *See* pp. 918–919 *infra.*

The primary distinction between this case and both *Smith* and *Zorach* is that the religious education is taking place on what appears to be school property. Photographs tendered by the plaintiffs indicate that the WRE school bus, which in most respects is indistinguishable from the defendants' school buses, parks directly in front of the entrance to plaintiff's school and only a matter of inches from the school's sidewalk. At other times the bus has parked in the school parking lot. While religious instruction is not taking place inside the school building, as it was in *McCollum,* it is also not taking place at locations well removed from school property as it was in *Zorach.*[4] Even if it is true that the street directly in front of the school, or the parking lot, are not legally titled to the school, the factor of overarching importance is the symbolic impact created by the *appearance* of official involvement. *See* pp. 918–919, *infra.* This is a

factor which is present regardless of the niceties of title. The second important distinction is the fact that WRE personnel have entered the defendants' classrooms to recruit students, and that employees of the defendants have taken an active part in the recruitment effort both by physical participation in the enrollment process and by verbal encouragement of the students.[5] The defendants' actions have gone beyond a mere accommodation of the desires of parents that their children have sectarian instruction available to them. *See Zorach,* 343 U.S. at 313–314, 72 S.Ct. at 683–684.[6] These facts render this case unlike *Zorach* and open to different analysis.

In recent decisions analyzing Establishment Clause issues arising in the public schools the Supreme Court has repeatedly relied upon the three part test set forth in *Lemon. See Edwards v. Aguillard,* 482 U.S. 578, 583–585, 107 S.Ct. 2573, 2577–2578, 96 L.Ed.2d 510 (1987); *Aguilar v. Felton,* 473 U.S. 402, 410–412, 105 S.Ct. 3232, 3236–3238, 87 L.Ed.2d 290 (1985); *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 382, 105 S.Ct. 3216, 3221, 87 L.Ed.2d 267 (1985); *Wallace v. Jaffree,* 472 U.S. 38, 55, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985). As the court stated in *Ball:*

> We have particularly relied on Lemon in every case involving the sensitive relationship between government and religion in the education of our children. The government's activities in this area can have a magnified impact on impressionable young minds.

*Ball,* 473 U.S. at 383, 105 S.Ct. at 3222. This same concern over the heightened sus-

---

**3.** It should be noted that the facts in this case are distinguishable from those in *Smith* as well.

**4.** In *Zorach* the program permitted the schools to release students "so that they may leave the school buildings and school grounds and go to religious centers." *Zorach,* 343 U.S. at 308, 72 S.Ct. at 681.

**5.** *Compare Zorach,* 343 U.S. at 311, 72 S.Ct. at 682: "If in fact coercion were used, if it were established that any one or more teachers were using their office to persuade or force students to take religious instruction, a wholly different case would be presented."

**6.** *See also Wallace v. Jaffree,* 472 U.S. 38, 74, n. 2, 105 S.Ct. 2479, 2481, n. 2, 86 L.Ed.2d 29 (O'Connor, J., concurring):

> When the State provides a moment of silence during which prayer may occur at the election of the student, it can be said to be adjusting the schedule of public events to sectarian needs. But when the State also *encourages* the student to pray during a moment of silence, it converts an otherwise inoffensive moment of silence into an effort by the majority to use the machinery of the State to encourage the minority to participate in a religious exercise.

(Emphasis added.)

ceptibility of young children was echoed by Justice O'Connor concurring in the opinion in Wallace:

> This Court's decisions have recognized a distinction when government sponsored religious exercises are directed at impressionable children who are required to attend school, for them the government endorsement is much more likely to result in coerced religious beliefs.

*Wallace,* 472 U.S. at 81, 105 S.Ct. at 2503. *See also Edwards,* 482 U.S. at 583–584, 107 S.Ct. at 2577.

This shift toward greater reliance on the *Lemon* test is a result of the Court's increasing sensitivity to the "symbolic impact of the union of church and state." *Ball,* 473 U.S. at 390, 105 S.Ct. at 3226. As noted, the symbolic impact of this union may be much greater upon young children than it is upon adults who have presumably developed a more questioning and skeptical attitude. Indeed, the court in *Ball* indicated that it was precisely this issue, the variance in the "symbolic impact," which distinguished *McCollum* from *Zorach. Id.* at 391, 105 S.Ct. at 3226. The variance was a result of the involvement of school facilities in *McCollum* and the absence of the involvement of those facilities in *Zorach. See id.,* n. 10, 105 S.Ct. at 3226, n. 10.

In *Ball,* the court worked a sort of integration of *Zorach* into the *Lemon* framework. While this same phenomenon was recognized by the Fourth Circuit in *Smith,* 523 F.2d at 124, the subsequent Supreme Court decisions cited above indicate to this court that when analyzing Establishment and Free Exercise claims in the public schools a greater reliance upon *Lemon* is mandated than was previously.[7] Recently, other federal courts have relied solely on the *Lemon* test when analyzing the constitutionality of WRE programs. *See Ford v.*

*Manuel,* 629 F.Supp. 771, 774–777 (N.D. Ohio 1985) (under *Lemon* test it is unconstitutional for a school board to allow student groups to use school facilities for WRE activities immediately before and after the official school day). *See also Spacco v. Bridgewater School Dist.,* 722 F.Supp. 834, 841 (D.Mass.1989), where the court, analyzing an Establishment Clause claim in the public school context, looked to the "endorsement" test articulated by Justice O'Connor in *Lynch v. Donnelly,* 465 U.S. 668, 687, 693–694, 104 S.Ct. 1355, 1366, 1369–1370, 79 L.Ed.2d 604 (1984) and adopted by the Court in *County of Allegheny,* 109 S.Ct. at 3099–3100 (1989) in concluding that the plaintiffs had demonstrated a likelihood of success on the merits. Greater reliance on *Lemon* is also indicated in light of the allegations in this case that school teachers may have exerted pressure upon the students to participate in WRE's program.[8] In light of the foregoing analysis, the court concludes that the present plaintiffs have demonstrated a likelihood of success upon the merits.

The final factor, a consideration of where the public interest lies, also militates heavily in favor of granting the motion. First Amendment rights cut to the very core of this society's values; perhaps more than anything else the desire to be free from state promoted religion and its resulting pressures, and the desire to be free to worship according to one's own beliefs without persecution, were what lead the colonists to our shores. Additionally, where a federal statute, in this case 42 U.S.C. § 1983, prohibits the alleged acts of the defendants and the Constitution provides the gravamen of the complaint the plaintiff is most clearly aligned with the public interest. *See Blackwelder,* 550 F.2d at 197. The court finds that the public interest weighs in favor of granting a TRO.

---

**7.** This is due, in large part, to the weight that has come to be given to the "appearance of endorsement," *County of Allegheny v. American Civil Liberties Union,* —— U.S. ——, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472 (1989). *See also Smith v. Lindstrom,* 699 F.Supp. 549 (W.D.Va. 1988), *aff'd,* 895 F.2d 953, *reh'g and reh'g en banc denied* (4th Cir.1990). While this focus on the appearance of endorsement is not an alternative to the *Lemon* test, it is a way of sharpen-

ing the focus *Lemon* mandates. *Id.* at 554. It indicates that this court must pay particular attention to whether the defendants' actions appear to give official endorsement to a particular religious belief, or to religious beliefs over non-belief.

**8.** See n. 6, *infra.*

Defendants raised several objections to entering a TRO which do not fit within the *Blackwelder* framework but which the court feels should be addressed. First, they argue that those activities which the plaintiffs have complained of are violative of the defendants' own policies and had they been made aware of any violations they would have corrected them. Consequently, defendants contest, an injunction is improper. Defendants have provided the court with a copy of their policy and a May 14, 1990, resolution of the Board regarding its intent to ensure strict compliance with that policy.

The first, and most important, flaw in the defendants' argument is that their policy does not prohibit those activities which the court finds most problematic. Parking the WRE buses directly in front of the school, allowing entry of WRE personnel into the school buildings and into the individual classrooms, and allowing students to be removed from class without permission for recruitment purposes all appear to be acceptable under the policy.[9] There is no dispute that these activities have taken place in the past, nor is there any serious dispute that they will continue in the future. While it is true that some of the activity complained of is indeed prohibited by the Board's policy, and the Board has indicated its willingness to ensure strict compliance with the policy in the future, there is before the court, nonetheless, evidence of serious violations of that policy in the past. The Board may abide by its policy; however, it appears to the court that activities forbidden by the Constitution are allowed under the policy and the court shall enjoin those activities.

By the memorandum tendered by the defendants, the court is presented with a defense which proceeds on the theory that because the school board has adopted an allegedly acceptable policy in this area, the school system is thereby exonerated from any responsibility for the actions which are alleged in the verified complaint. In brief, this defense asserts that so long as the written document exists, conduct may not be considered in resolving the issues in this case. Leaving aside the question of whether the proffered policy covers all of the incidents alleged in the verified complaint, the court is presented with a defense which says, "Look only to the policy; do not consider how the policy is ignored or implemented in a way not consonant with the policy." Such a proposition appeals not a whit to this court. The question for resolution before this court is what in fact has been done in the operation of the WRE program; the question is not whether the paper resolution is to give the answer to the question posed.

As a further reason for denying an injunction defendants argue that they have had no forewarning of problems or violations of their policy and had they been given such advanced notice they would have corrected any problems. This contention suffers from the same problem as the previous one, namely that defendants believe certain activity is acceptable which the court and the plaintiffs do not. Thus, it is unlikely that prior notice would have resulted in any change in those areas. Additionally, the record indicates that defendants have had indications that there were constitutional problems with their policy, as well as violations of the policy, for some time.

In 1982, the ACLU wrote to defendant Ebersole outlining what it considered to be acceptable limits for a released time program. Ebersole responded that the policy of the Board would be restructured and that the legality of any new policy would be checked before final approval. Almost one year before the filing of this suit plaintiff Martha Doe wrote to Ebersole outlining problems she found with the policy as applied, and also setting forth incidents which appeared to be violations of that policy. Ebersole responded on July 5, 1989, by stating that some of these actions had been approved by him and, as to the rest, offered no indication that he or the

---

9. Indeed, the policy of allowing students to be removed to the bus for recruitment purposes, apparently in this case without parental con-sent, was specifically "approved" by defendant Ebersole. *See* letter of July 5, 1989 from Ebersole to Martha Doe.

Board intended to do anything in response. At the very least, Martha Doe's letter is constructive notice to the Board that at least one school patron perceived serious problems in the manner in which the WRE program was being operated.

To conclude succinctly, the *Blackwelder* test has been met, and the defendants have offered nothing which would indicate that other considerations militate against the entry of a temporary restraining Order.

### III

In light of the facts so far presented in this case, and this court's understanding of the current state of law on the issues involved in this case, the court concludes that the plaintiffs have shown a strong likelihood of success on the merits. They have also shown irreparable harm. The balance of harms is strongly in their favor as is the public interest. Accordingly, this court must grant the temporary restraining order.

An appropriate Order shall this day issue.