**STUART CIRCLE PARISH,**
**et al., Plaintiffs,**

v.

**BOARD OF ZONING APPEALS OF THE CITY OF RICHMOND, VIRGINIA, et al., Defendants.**

Civil Action No. 3:96cv930.

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 26, 1996.

William H. Sooy, Richmond, VA, for plaintiffs.

Keith A. May, Elizabeth B. Stutts, Office of the City Attorney, Richmond, VA, for defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on plaintiffs' motion for a temporary restraining order. For the reasons set forth below, the motion is granted.

### I. Procedural History

The plaintiff, Stuart Circle Parish, is a partnership comprised of six churches of different denominations located within about five blocks of each other in the Stuart Circle area of the City of Richmond. One of those churches is First English Evangelical Lutheran Church ("First English Church"). The Reverend Richard A. Olson, another plaintiff, is the pastor of First English Church. The Stuart Circle Parish provides a Meal Ministry which offers worship, hospitality, pastoral care, and a healthful meal to the urban poor of Richmond on Sunday afternoons from 3:30 p.m. to 4:15 p.m. The Meal Ministry is conducted at First English Church because it has the largest parish hall and the best facilities for the conduct of the Meal Ministry of the six constituent churches in Stuart Circle Parish. Approximately one hundred people, some homeless, some not, but nonetheless needy, participate in the Meal Ministry every Sunday. The formal ministry in this case began about 15 years ago at Pace Memorial Methodist Church, one of the member churches of Stuart Circle Parish. The program outgrew Pace Memorial, and about six months ago it was decided to operate the ministry at First English Church.

Members of each constituent church participate in offering and conducting Sunday afternoon ministry which consists of prayer, worship, fellowship, and a meal. The guests at the service circulate through the facility so that not all persons are present at the same time. However, to facilitate the worship atmosphere, the meal is served to participants at tables by parishioners, not cafeteria style. Often the meal is accompanied by informal Bible study and informal counselling.

The City's Zoning Administrator ("Administrator") received complaints from neighbors of First English Church. The complaints were about unruly behavior, public urination and noise in the area. The City's evidence did not establish where or when these acts occurred or that they were performed by those served by the Meal Ministry. Based upon an investigation which ensued from the complaints, the Administrator determined that the Meal Ministry was feeding more than thirty persons on a regular basis and found that to be in violation of the Richmond City Zoning Ordinance ("Code"). According to the Zoning Administrator, the Meal Ministry violates a section of the Code which limits feeding and housing programs for the homeless within churches to no more than thirty homeless individuals for up to seven days between the months of October and April. *Id.* § 32–402.2(9).

The Stuart Circle Parish appealed the Administrator's determination. But, on November 6, 1996, the Board of Zoning Appeals ("BZA") upheld the Administrator's determination. Rather than appealing the BZA's decision to the Circuit Court of the City of Richmond, which may be done by plaintiffs as a matter of right, plaintiffs brought this action, seeking temporary and permanent injunctive relief from the BZA's decision to apply the Code to the Meal Ministry. The Complaint alleges that the application of the Code to the plaintiffs violates their rights to the free exercise of religion as protected by the First Amendment and by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA"). RFRA provides that a government shall not substantially burden a person's exercise of religion unless it demonstrates that application of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1. Plaintiffs view the Meal Ministry as the physical embodiment of a central tenet of the Christian faith, ministering to the poor, the hungry and the homeless in the

community. And, they assert that the City has not shown a compelling state interest for burdening the exercise of this central tenet by the members and pastors of the six churches which compromise Stuart Circle Parish.

## II. The Richmond City Code

The Code provides that churches or other places of worship are permitted *principal uses* in residential districts. Richmond City Code § 32–401.1.[1] The Code does not define the term "church," or the religious activity conducted therein. Instead, the Code affords undefined terms, such as "church" and "places of worship," their usual dictionary meaning. Plaintiffs assert that their participation in the Meal Ministry is within the usual reach of the terms church and places of worship, and thus constitutes a permissible principal use in the R–6 district in which First English is located. The Zoning Administrator and the BZA, however, view the situation differently. First, the Administrator and the BZA contend that the services provided by the Meal Ministry constitute a non-permitted use of the church for which a conditional use permit is required. Second, they maintain that the Meal Ministry is a "feeding program" which must be conducted in compliance with the Code's restrictions. Specifically, Section 32–402.2 of the Code provides that:

> Accessory uses and structures, including the following which are customarily incidental and clearly subordinate to permitted principal uses, shall be permitted in the R–1 District: ... (9) Temporary feeding and housing of not more than thirty (30) homeless individuals within churches or other places of worship, subject to meeting applicable building code and fire code requirements, for up to a total of seven (7) days and only within the time period beginning on October 1 of any year and ending on April 1 of the following year; provided, however, that for the period October 1, 1991, through April 1, 1992, such

persons shall be allowed to stay for up to thirty (30) days.

According to the Complaint and plaintiffs' briefs, the application of either interpretation of the Code to the plaintiffs creates a substantial burden on the free exercise of their religion, offending the First Amendment and RFRA.

## III. Abstention

Defendants urge the Court to abstain from deciding whether the application of the zoning code to the Meal Ministry offends the plaintiffs' rights whether under RFRA or the First Amendment.

### A. *Younger* Abstention

Abstention under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), requires: "(i) that there is a pending state judicial proceeding; (ii) that the action implicates important state interests; and (iii) that there is an adequate opportunity for the plaintiff to raise federal constitutional claims in a state forum." *National Home Ins. Co. v. State Corp. Comm'n*, 838 F.Supp. 1104, 1117 (E.D.Va.1993) (citing *Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982)). Both parties concede that the BZA was not authorized to consider constitutional challenges to the Code, that the Circuit Court of the City of Richmond is generally limited to reviewing the record before the BZA, and that a prima facie presumption exists that the BZA properly exercised its discretion. Even if the state court decided to take additional evidence, it could not decide the constitutional or statutory rights here presented by plaintiffs. Hence, in the present action, there exists no adequate opportunity for the plaintiffs to raise their federal claims in a state forum. Thus, the court will not exercise its discretion to abstain under *Younger.*

### B. *Pullman* Abstention

Abstention is also inappropriate under the *Pullman* doctrine. In *Railroad*

---

1. Section 32–402.1 provides that "The following uses of buildings and premises shall be permitted in the R–1 District: ... (3) Churches and other places of worship." Although the Meal Ministry is located in an R–6 district, Section 32–412.1 permits "Any principal use permitted in the R–1 District as set forth in Section 32–402.1."

*Commission of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), plaintiffs brought suit in federal court, alleging that an order promulgated by the Texas Railroad Commission was unauthorized by Texas law as well as violative of the Equal Protection, Due Process and Commerce Clauses of the Constitution. The Supreme Court held that, because the complaint "tendered a substantial constitutional issue," which "touched upon a sensitive area of social policy," the federal courts should not decide the issue unless "no alternative to its adjudication is open. Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy." *Pullman,* 312 U.S. at 498, 61 S.Ct. at 644. With regard to the state law issues raised by the plaintiffs in the *Pullman* case, the Supreme Court voiced its concern with asking a federal court to "forecast" state law. As the Court explained, "a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." *Id.* at 499–500, 61 S.Ct. at 645. Finally, the Supreme Court noted that abstention provided a means to "restrain ... authority because of 'scrupulous regard for the rightful independence of state governments' and for the smooth working of the federal judiciary." *Id.* at 501, 61 S.Ct. at 645. (citations omitted).

Thus, *Pullman* stands for the proposition that "where state law is uncertain and a clarification of state law might make a federal court's determination of a constitutional question unnecessary, the federal court should abstain until the state court has had an opportunity to resolve the uncertainty as to state law." Erwin Chemerinsky, *Federal Jurisdiction,* Second Edition, 688 (1994). It has also been said that abstention under *Pullman* rests upon three rationales: (1) the avoidance of friction between federal and state courts; (2) the avoidance of erroneous interpretations of state law; and (3) the avoidance of unnecessary constitutional rulings. *Id.* at 688–90.

In this action, there has not been a determinative ruling by the state court on the local issue of whether the Meal Ministry would constitute a principal use of a church. Moreover, the Code is uncertain as to what constitutes the permitted uses of a "church" as well as what constitutes a permissible accessory use. "Church" is undefined, and the only "accessory use" that could apply to the Meal Ministry involves the "feeding *and* housing" of the homeless. No party disputes that the Meal Ministry does not house the homeless. Hence, as in *Pullman,* a review of the BZA's decision by the Circuit Court of the City of Richmond, or an action by the City to enforce obedience to the BZA's order, could result in a finding that feeding the homeless falls within a church's permitted uses. Such a decision would terminate the present controversy.

■ However, "in determining whether an issue of state law is sufficiently unsettled to warrant *Pullman* abstention, the relevant inquiry is not whether there is a bare, though unlikely possibility that state courts might render adjudication of the federal question unnecessary. Rather, ... 'abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction.'" *Shell Island Investment v. Town of Wrightsville Beach,* 1990 WL 41050 (4th Cir.1990) (quoting *Hawai'i Hous. Auth. v. Midkiff,* 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984)) (internal quotations omitted). In this action, both parties agree that because of the prima facie presumption that the BZA properly exercised its power and discretion, it is highly unlikely that the Circuit Court of the City of Richmond would overturn the BZA's decision.[2] Thus, abstention in this case would not further the *Pullman* policy of avoiding friction between federal and state courts.

The second reason that the Court will not abstain under *Pullman* is that plaintiffs have not asked the Court to interpret the City Code. Thus, abstention would not serve to

**2.** Although this Court finds the interpretation of the Code by the Administrator and the BZA to be highly unusual and somewhat inconsistent with the English language, that issue is not before this

Court and, for purposes of this Motion, the Court will accept the views of the parties respecting the dire prospects for success of the plaintiffs' appeal.

avoid an erroneous interpretation of state law.

Yet another reason for rejecting abstention is that, unlike *Pullman*, this action involves both a federal statutory claim and a federal constitutional claim (if the pleadings are to be believed) or a federal statutory claim (if counsel's statement at oral argument is accepted). Thus, the judicial policy that a constitutional issue should not be prematurely decided has no application.

Finally, in this case, securing a definitive ruling from the state courts cannot be pursued with full protection of the plaintiffs' rights. Here, a sensitive federal right, the free exercise of religion, is at issue. Although it is true, as defendants point out, that plaintiffs will be able to raise their federal claims at a later date and would not be prejudiced in that respect, were the court to abstain in this case, plaintiffs will be prevented from conducting their religious activities for an unknown, but most likely extended, period of time. It is clear that their rights would not be addressed until after completion of the state proceeding which could involve an appeal from the decision of the Circuit Court of the City of Richmond to the Supreme Court of Virginia. It is also undisputed that the Circuit Court of the City of Richmond cannot consider the plaintiffs' federal claims because that court possesses only a limited review of the record before the BZA. For all of these reasons, abstention under *Pullman* would not afford adequate protection to plaintiffs' rights. *See Pullman*, 312 U.S. at 501, 61 S.Ct. at 645 ("In the absence of any showing that the [ ] obvious methods for securing a definitive ruling in the state courts cannot be pursued with full protection of the constitutional claim, the district court should exercise its wise discretion by staying its hands.") (citation omitted).

### C. *Burford* Abstention

■ Whether the Court should abstain under *Burford* raises a more difficult question. Under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and its progeny, the Supreme Court found that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the

proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar,' or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Public Service, Inc. v. City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976)).

Although earlier Supreme Court jurisprudence could be read to "justify abstention whenever there is a federal constitutional challenge to a state administrative decision that also could be reviewed in state court," later cases indicate a more narrow understanding of the *Burford* doctrine. *See* Chemerinsky, *supra* at 704–5. For instance, in *Zablocki v. Redhail*, 434 U.S. 374, 379 n. 5, 98 S.Ct. 673, 677 n. 5, 54 L.Ed.2d 618 (1978), the Supreme Court explained that "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." Moreover, the Supreme Court also has held that "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a potential for conflict, with state regulatory law or policy." *New Orleans Public Service, Inc.*, 491 U.S. at 362, 109 S.Ct. at 2515.

■ Thus, complex state administrative procedures alone do not justify abstention. Rather, "*Burford* abstention requires that the administrative system have a primary purpose of achieving uniformity within a state and that there be the danger that judicial review would disrupt the proceedings and undermine the desired uniformity." Chemerinsky, *supra*, at 706. Indeed, it must be remembered that abstention is "'the exception, not the rule.'" *New Orleans Public Service*, 491 U.S. at 359, 109 S.Ct. at 2513.

1232

(quoting *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984)).

The Fourth Circuit has determined that "... cases involving questions of state and local land use and zoning law are a classic example of situations in which 'the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Pomponio v. Fauquier County Board of Supervisors,* 21 F.3d 1319, 1327 (4th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 192, 130 L.Ed.2d 125 (1994) (quoting *New Orleans Public Service,* 491 U.S. at 361, 109 S.Ct. at 2514) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). In *Pomponio,* the Fourth Circuit also held that:

> In cases in which plaintiffs' federal claims stem solely from construction of state or local land use or zoning law, not involving the constitutional validity of the same and absent exceptional circumstances not present here, the district courts should abstain under the Burford doctrine to avoid interference with the State's or locality's land use policy.

*Pomponio,* 21 F.3d at 1328.

However, the Fourth Circuit also explained that the requirement for *Burford* abstention would not apply to cases presenting "unusual circumstances," such as those involving a genuine and independent federal claim, including religious prejudice, *Marks v. City of Chesapeake, Va.,* 883 F.2d 308 (4th Cir.1989), and federal statutory preemption, *Neufeld v. City of Baltimore,* 964 F.2d 347 (4th Cir.1992). One may argue that because *Pomponio* was an action for damages, the Supreme Court's decision in *Quackenbush v. Allstate Ins. Co.,* — U.S. —, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)—that abstention, which derives from a court's equitable powers, has no place in damage cases—implicitly overrules *Pomponio.* On the other hand, the reasoning of *Pomponio* reflects a thorough review of previous Fourth Circuit and Supreme Court precedent and demonstrates the Fourth Circuit's view on federal court

involvement in zoning cases. For these reasons, *Pomponio* may not be disregarded, notwithstanding the recent decision in *Quackenbush.*

Although this action involves disputed issues about the construction of land use and zoning codes, the correctness of the BZA's interpretation of the Code remains wholly irrelevant to these proceedings. Rather, this action calls for deciding the question of whether, assuming the BZA has correctly interpreted the zoning Code, the application of the Code to the plaintiffs' activities violates a very important federal right, the free exercise of religion. Indeed, in enacting RFRA, Congress described the free exercise of religion as an "unalienable right" which may not be substantially burdened in the absence of a compelling state interest. Thus, "[u]nlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors, federal adjudication of this sort of ... claim would not disrupt the State's attempt to ensure uniformity in the treatment of an 'essentially local problem.'" *New Orleans Public Service, Inc.;* 491 U.S. at 362, 109 S.Ct. at 2515 (discussing preemption claim) (quoting *Alabama Pub. Serv. Comm'n v. Southern Railway,* 341 U.S. 341, 347, 71 S.Ct. 762, 767, 95 L.Ed. 1002 (1951)).

Moreover, "this case involves neither a state claim in federal disguise, nor a facially meritless federal cause of action." *Bryant Woods Inn, Inc. v. Howard County Maryland,* 911 F.Supp. 918, 928 (D.Md.1996) (citing *Pomponio,* 21 F.3d at 1327). Indeed, quite unlike the Section 1983 cases cited by the *Pomponio* court in footnote 18 as the basis of the *Pomponio* opinion, here, plaintiffs have raised a claim which arises under RFRA, a federal statute providing direct federal relief for those whose religious freedoms have been substantially burdened in the absence of a compelling state interest. Because it involves a genuine and independent factual claim of religious prejudice, this case falls squarely within the exception recognized in *Pomponio.* *Pomponio,* 21 F.3d at 1328.

The Court here is not sitting as a zoning board of appeals. *Pomponio,* 21 F.3d at

1327. Instead, it must decide whether a zoning code violates the rights protected by a federal statute and thus must be precluded from application to the plaintiffs under the Supremacy Clause. Nor is the issue presented here one which requires the special oversight expertise of Virginia's courts. *Front Royal and Warren County Industrial Park Corporation v. Town of Front Royal,* 922 F.Supp. 1131, 1140–41 (W.D.Va.1996) (adjudication of whether town's refusal to comply with non-discretionary mandate effects a taking without due process is not conduct in which the Virginia courts stand in special relationship of technical oversight) (citing *Educational Srvcs, Inc. v. Maryland State Board for Higher Education,* 710 F.2d 170, 173 (4th Cir.1983)). To the contrary, the controlling issue falls squarely within the province entrusted to federal courts. *See Neufeld v. City of Baltimore,* 964 F.2d 347, 350 (4th Cir.1992) (finding that determination of whether First and Fourteenth Amendments rights were violated by zoning laws did "not present difficult questions of state law concerning peculiarly local issues, nor would a federal decision disrupt the efficacy of an important and coherent state policy").

■ This conclusion finds support in the Senate Report accompanying RFRA, which was enacted in response to the Supreme Court's decision applying a test of general applicability to free exercise claims. Since that Supreme Court decision, the Congress found that:

> governments throughout the U.S. have run roughshod over religious conviction. Churches have been zoned even out of commercial areas * * * State and local legislative bodies cannot be relied upon to craft exceptions from laws of general application to protect the ability of the religious minorities to practice their faiths, an explicit fundamental constitutional right. As the Supreme Court said: The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free

press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

S.Rep. 103–111, U.S.Code Cong. & Admin.News 1993, pp. 1892, 1897 (quoting *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)). The mere fact that the Code section at issue here may be found to conflict with RFRA is no reason to abstain under *Burford* because "there ·is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail,* 434 U.S. 374, 379 n. 5, 98 S.Ct. 673, 677 n. 5, 54 L.Ed.2d 618 (1978); *see also Neufeld,* 964 F.2d at 351 ("of course the threat that the federal courts might decide the entire state system unconstitutional is not a valid justification for *Burford* abstention") (citation omitted).

For the foregoing reasons, this action is not an appropriate one for *Burford* abstention.

## IV. Ripeness

■ Defendants also argue that, because plaintiffs have not applied for a conditional use permit from the City, the requirements of the zoning Code have not been conclusively applied to them, and, thus, their claims are not ripe for judicial determination. In support of this argument, defendants rely upon *Oxford House, Inc. v. City of Virginia Beach,* 825 F.Supp. 1251 (E.D.Va.1993). In *Oxford House,* the plaintiffs claimed that the City's zoning ordinances, permitting group homes of more than four unrelated people in single family areas only upon the award of a conditional use permit, violated the Fair Housing Act. This Court held that plaintiffs' claims were not ripe because the operators of the homes had not applied for a conditional use permit from the City.

The Court finds unpersuasive the defendants' argument that this action is controlled by *Oxford House* because that case is distinguishable from this action. In *Oxford House,* the statute at issue, the Fair Housing Act, defined discrimination to include "the refusal to make reasonable accommodations

in rules, policies and practices." Thus, Congress obviously contemplated that cities should have the opportunity "to adjust their generally applicable rules to allow handicapped individuals equal access to housing." *Oxford House*, 825 F.Supp. at 1261. Consequently, whereas in *Oxford House*, the failure of the plaintiffs to pursue a conditional use permit may have prevented the City from complying with the statute by precluding them from making "reasonable accommodation," RFRA contains no such "accommodation" requirement, and the City need not be given an opportunity to do the same. Here, plaintiffs have filed an action charging that the Code as interpreted by the BZA, violates their rights under RFRA. This decision now constitutes the law and policy of the city and is final. Because of that decision, the plaintiffs are unable to participate in the Meal Ministry. Thus, their harm here is real, immediate, and threatens to continue. *See Bryant Woods Inn, Inc. v. Howard County Maryland*, 911 F.Supp. 918, 926 (D.Md.1996). Hence, the plaintiffs' claims are ripe for purposes of this action.

## V. Temporary Restraining Order

The grant of interim injunctive relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir.1992) (citation omitted). In this circuit, the decision whether to exercise this power is controlled by the hardship balancing test which involves the application of four factors:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

(*Id.* at 812 (citations omitted)). It is the plaintiff's responsibility to establish that each of the four factors warrants the exercise of the extraordinary power of injunction. First, the plaintiffs must make a "clear showing of

irreparable harm as a condition for the grant of a preliminary injunction," and, the irreparable harm "must be 'neither remote nor speculative, but actual and imminent.'" *Id.* (citations omitted). Unless the plaintiffs prove irreparable injury, the analysis never proceeds further.

Under the balancing of hardships tests, the second step is to consider the likelihood of harm to the defendants from the grant of injunctive relief and then to balance the likelihood of irreparable harm to the plaintiffs from failing to grant such relief against the likelihood of harm to the defendants if it is granted. *Id.* The third step involves the consideration of success on the merits. In that regard:

> If, after balancing those two factors [*i.e.*, irreparable harm to plaintiff against the harm to the defendant], the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

(*Id.* at 812–13 (citations omitted)). In other words, if the balance of harm strongly favors the plaintiffs, it is not required that the plaintiffs make a strong showing of likelihood of success on the merits. This is because the hardship balancing test is a "sliding scale" approach and "the more the balance of irreparable harm inclines in the plaintiffs' favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." (*Id.* at 813 (citations omitted)).

■ Therefore, the party seeking an injunction can meet its burden by showing a combination of *probable* success and the *possibility* of irreparable injury or by showing that serious legal questions are raised on the merits and that the balance of hardships is decidedly in his favor. However, the judge ought to require " 'a fairly clear cut probability of success if he did not find that the harm to the plaintiff outweighed harm to the de-

fendant *to a significant degree.*'" *Id.* (citations omitted) (emphasis added).

Finally, the Court must determine the public interest and assess how it will be affected by the grant or denial of the requested injunction.

### A. Irreparable Harm—The Balance Tips in Favor of Plaintiffs

■ Plaintiffs maintain that the Meal Ministry constitutes religious conduct and is protected by the Religious Freedom Restoration Act and the First Amendment. According to plaintiffs, unless the court issues a temporary restraining order, the Meal Ministry will be unable to continue. Thus, plaintiffs will suffer irreparable injury because they will be prevented from practicing the free exercise of their religion.

■ Plaintiffs have satisfied their burden of proving irreparable injury because, unless the injunction is granted, they will continue to be prevented from engaging in the free exercise of their religion. Although there is some uncertainty respecting whether a constitutional injury has been alleged by plaintiffs, it is clear that "[v]iolations of First Amendment rights constitute per se irreparable injury." *Doe v. Shenandoah County School Board,* 737 F.Supp. 913, 916 (W.D.Va. 1990) (citing *Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir.1978) *see Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976)). "This is true even where the impairment exists for only a minimal period of time." *Doe,* 737 F.Supp. at 916 (citing *Joyner v. Lancaster,* 553 F.Supp. 809, 815 (M.D.N.C.1982) *see also Quaker Action Group v. Hickel,* 421 F.2d 1111 (D.C.Cir. 1969)) (citation omitted).

Even if this action involves only the deprivation of the right to freely exercise religion as protected by RFRA, irreparable injury has still been established. Although it may be the case, as defendants allege, that "preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safe-guards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by other strict legal and equitable principles that restrain courts," *Northeastern Florida Chapter v. Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990), *rev'd on other grounds,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), this action presents a statute unlike most others.

In enacting RFRA, Congress accorded special status to free exercise claims. First, it found that the framers of the Constitution recognized the free exercise of religion as an unalienable right. Moreover, Congress found that the free exercise of religion should be substantially burdened only if the state has a compelling interest. Thus, Congress has provided free exercise claims with the same level of protection as is available for the infringement of fundamental rights.

As further discussed below, the Court finds that plaintiffs have proven a substantial likelihood of showing that by prohibiting plaintiffs from participating in the Meal Ministry, plaintiffs' federally protected right to exercise religion was substantially burdened in the absence of a compelling state interest. This constitutes irreparable harm that is neither remote nor speculative, but actual and imminent. Indeed, plaintiffs have shown that because of the BZA's ruling, the Meal Ministry was prevented from operating on Sunday, November 10, 1996 and Sunday, November 17, 1996. This deprivation of plaintiffs' religious rights will continue for an unknowable period of time absent temporary injunctive relief.

Plaintiffs also have shown that they will be irreparably injured because they have been, and will be, deprived of the right to vindicate their federal rights. Plaintiffs were not able to raise the free exercise of religion as a defense in the proceedings before the zoning administrator or the zoning board of appeals. In other words, plaintiffs have been deprived of the right to raise such claims as a defense, as contemplated by RFRA. Moreover, plaintiffs will not be able to raise their free exercise claim as a defense in the Circuit Court of the City of Richmond on appeal. Thus, unless a temporary restraining order is granted, plaintiffs will not only be deprived of the right to engage in the free exercise of reli-

gion, but will also be deprived of the right to challenge the deprivation on the basis of either the Constitution or federal law. This alone satisfies the irreparable injury requirement.

### B. Harm If An Injunction Is Not Granted

On the other hand, the Court finds that granting the temporary injunction will not work irreparable injury on the defendants. The injunctive relief here will return the parties to their status quo ante positions, pending a trial on the merits. The record reflects nothing which bespeaks irreparable harm to the City in permitting the Meal Ministry to continue, as it did for a considerable period before the Administrator issued his cease and desist order. Of course, defendants have a substantial interest in the maintenance of a rational zoning system. But here the defendants have not shown how the system or the neighborhood would specifically suffer irreparable injury if the temporary restraining order is granted. Indeed, although the defendants had received complaints about unruly conduct, noise, and public urination, they could not substantiate that those complaints actually involved persons who were involved in the Meal Ministry. To permit a conclusory assertion that any deviation from the zoning laws would irreparably harm the system would be the equivalent of saying that enforcement of the zoning laws may never be enjoined. And, of course, that is not so.

In conclusion, the balance of the hardships 'tips decidedly' in favor of the plaintiffs and thus a preliminary injunction will be granted if the plaintiffs have raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for litigation and thus for more deliberate investigation. It is to this issue that the Court now directs its attention.

### C. Likelihood Of Success On The Merits

#### 1. Participation in the Meal Ministry As the Free Exercise of Religion

The Court finds that plaintiffs have raised questions going to the merits of the free exercise issue that are so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. Plaintiffs have made a strong showing that feeding the poor constitutes a central tenet of the religion practiced at the six churches involved in the Meal Ministry.

Testimony by one witness showed that the feeding of the urban poor in Richmond is an extension of their morning worship, which has been an ongoing tradition for many years. Indeed, caring for the poor has been central to the Methodist faith and was a formal teaching of John Wesley, the founder of Methodism. Another witness testified that one of the most important facets of her religion is sharing in the Eucharist, which is the equivalent of sharing in a meal with God and the congregation. Sharing a meal with the homeless is a natural extension of this practice. Finally, a witness, who qualified as an expert in Christian theology, testified that feeding the poor is central to the Christian teachings of all denominations comprising Stuart Circle Parish. The witness pointed to passages in the Bible in both the Old and New Testament, including the Sermon on the Mount and the sharing of the loaves and fishes, demonstrating the centrality of this teaching. Some of these passages show that, for the plaintiffs, the feeding of those less fortunate constitutes methods of obtaining a blessing and the means to redemption:

> I was hungered and ye gave me meat; I was thirsty, and ye gave me drink; I was a stranger and ye took me in ... Verily I say unto you, Inasmuch as ye have done it unto one of the least of these my brethren, ye have done it unto me.

> Then shall he say also unto them on the left hand, Depart from me, ye cursed, into everlasting fire, prepared for the devil and his angels: For I was hungered, and ye gave me no meat; I was thirsty and ye gave me no drink; I was stranger, and ye took me not in ... And these shall go away into everlasting punishment; but the righteous into life eternal. Matthew 25:35, 40–43, 46.

Clearly, then, plaintiffs have given strong evidence that the Meal Ministry is motivated by their religious belief and that their participation in the Meal Ministry constitutes the free exercise of religion. If they prevail on that issue at trial, they would thus be protected by RFRA. There is then the basis for further litigation of this issue.

### 2. The Asserted Burden on the Free Exercise of Religion

RFRA provides that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b).

As the Fourth Circuit explained in *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir.1995), "Congress passed RFRA as a response to *Employment Div. Dep't of Human Resources v. Smith*, 494 U.S. 872 [110 S.Ct. 1595, 108 L.Ed.2d 876] (1990). The 'findings' section of RFRA states that *Smith* 'virtually eliminated the requirement that government justify burdens on religious exercise imposed by laws neutral toward religion.' 42 U.S.C. § 2000bb(a). The 'purpose' section adds that RFRA aims 'to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965], and *Wisconsin v. Yoder*, 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972).' *Id.* at § 2000bb(b)." *American Life League, Inc.* 47 F.3d at 655.

 "In analyzing a claim under RFRA, we look first at whether a substantial burden has been imposed on the exercise of sincerely-held religious beliefs, and then determine whether the state can justify the imposition of that burden." *Goodall By Goodall v. Stafford County School Board*, 60 F.3d 168, 171 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 706, 133 L.Ed.2d 661 (1996). "Thus, if [plaintiffs] cannot show that their exercise of religion is substantially burdened by the [City's] zoning policy, the [City] is not required to come forth with proof of its interest." *Id.* (citations omitted). "Since RFRA does not purport to create a new substantial burden test, we may look to pre-RFRA cases in order to assess the burden on the plaintiffs for their RFRA claim." *Id.* "It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.'" *Id.* (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961) (plurality opinion).

In *Goodall*, the Fourth Circuit found no "substantial burden" when plaintiffs were "neither compelled to engage in conduct proscribed by their religious beliefs, nor ... forced to abstain from any action which their religion mandates that they take." *Id.* at 172–73; *see also Woods v. Evatt*, 876 F.Supp. 756, 762 (D.S.C.1995), *aff'd by unpub. opin.*, 68 F.3d 463 (4th Cir.1995) (A "practice places a substantial burden on the religious exercises of inmates if it coerces them into violating their religious beliefs, or if it compels them ... by threat of sanctions, to refrain from religiously motivated conduct.") (internal quotations omitted).

Defendants argue for a narrow reading of *Goodall*, claiming that a substantial burden may only be shown where a state forbids conduct that is required or mandates conduct that is forbidden. This argument goes too far. In the legislative history to RFRA, Congress specifically stated that "in order to violate the statute, government activity need not coerce individuals into violating their religious beliefs nor penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by any citizen. Rather the test applies whenever a law or an action taken by the government to implement a law burdens a person's exercise of religion." H.R.Rep. 103–88. There is, therefore, evidence that Congress did not intend the stringent test urged by the defendants.

In any event, this Court does not read *Goodall* as adopting the per se rule for defining substantial burden that Congress expressly has eschewed. Rather, when taken in the context of the remainder of the *Goodall* opinion, the Fourth Circuit was merely

addressing the issue before it and, in so doing, found no substantial burden on plaintiffs' exercise of religion when a school district refused to pay for a speech interpreter for a student who wanted to attend a religious school even though the district paid for an interpreter when the child attended public school.

At least one other court within the Fourth Circuit has assumed, without deciding, that *Goodall* does not require that a "substantial burden" will be found only when a person is compelled to do something forbidden by religion or forced to refrain from action required by religion. *Turner–Bey v. Lee,* 935 F.Supp. 702 (D.Md.1996). Rather, in *Turner–Bey,* the court found that in "determining the substantiality of the burden, it is certainly appropriate to take into account as one of the factors to be determined whether a particular practice is mandated by a religion or simply encouraged * * * Another factor that obviously must be taken into account ... is the extent of the interference." *Turner–Bey,* 935 F.Supp. at 703.

The more flexible approach taken in *Turner–Bey,* which is not antithetical to *Goodall,* accords with Congressional intent and the approach adopted by the Seventh, Eighth and Tenth Circuits.[3] In *Mack,* the Seventh Circuit adopted the rule that "a substantial burden on the free exercise of religion, within the meaning of the Act, is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Id.* at 1179.

Considering the current state of the law, the Court finds that plaintiffs have raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.

Before concluding however, the Court must address the defendants' claims that no

substantial burden exists in the present case because the City's zoning laws do not prevent the feeding of the homeless but merely restrict the number of persons who may be fed. Specifically, defendants contend that there are six churches in Stuart Circle Parish and that each church can legally feed and house up to thirty homeless individuals for up to a total of seven days after October 1, 1996. A total of 180 homeless persons can be accommodated by the Parish, as a whole, and, the defendants argue that the Parish can reasonably accommodate its food ministry throughout the six churches with only minor inconvenience, if any, to their religious conduct. Moreover, the members of the Parish may volunteer their services elsewhere. *Compare Daytona Rescue Mission, Inc. v. City of Daytona Beach,* 885 F.Supp. 1554, 1560 (M.D.Fl.1995) (no substantial burden where plaintiffs failed to show that City code prevented them from running shelter or food programs anywhere in Daytona Beach) *with The Jesus Center v. Farmington Hills Zoning Board of Appeals,* 215 Mich.App. 54, 544 N.W.2d 698, 704 (1996) (finding substantial burden from zoning board's decision to require plaintiffs to move operation or relocate shelter apart from worship facility) *and Western Presbyterian Church v. Board of Zoning Adjustment,* 862 F.Supp. 538, 546 (D.C.1994) (finding that "once the zoning authorities of a city permit the construction of a church in a particular locality, the city must refrain, absent extraordinary circumstances, from in any way regulating what religious functions the church may conduct").

Defendants also argue that it is "well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive'". *Goodall,* 60 F.3d at 171 (quoting *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961)). In this action, defendants contend that the plaintiffs have shown only that operating the Meal Ministry in

---

**3.** *See Mack v. O'Leary,* 80 F.3d 1175, 1178 (7th Cir.1996) (noting intercircuit split, which may be accidental and not that inconsistent, between the Fourth, Ninth, and Eleventh Circuits which narrowly define substantial burden (as requiring the

compulsion of that which is forbidden or the compulsory restraint of something compelled) and the Eighth and Tenth Circuits (more broadly defining term) and the Sixth Circuit (straddling the difference)).

accordance with the zoning laws would be more inconvenient and more expensive, and, therefore, that there is no substantial burden on the free exercise of religion.

True enough, participants in the Meal Ministry may volunteer for other programs that provide sustenance to the poor and homeless. Or in the alternative, the Meal Ministry may be offered simultaneously at one or more of the several different churches, which are located within a five block radius. Alternatives such as these may increase the cost of the Meal Ministry and make it inconvenient, but this showing alone would be insufficient to prove a substantial burden for the reasons stated above.

However, the plaintiffs showed that it was central to their faith to invite the homeless into the church in order to establish a climate of worship. This climate simply would not exist if the Meal Ministry was not conducted in a church or if the volunteers offered it in some non-sectarian fashion. Moreover, witnesses also testified that it is the gathering together as a community to share in the meal that constitutes the essence of their faith. This communal gathering would be lost, or at least greatly diminished, if the participants were forced to move elsewhere or to be diversified. Finally, as to the suggestion that the meals be shared among several of the churches, testimony showed that the synergy of the group and the continuity of meeting with the same people in the same atmosphere would be lost, rendering the practice of their faith less effective and less meaningful. For all of these reasons, plaintiffs have raised substantial issues which tend to prove that the ordinance would require them to "refrain from religiously motivated conduct [or] inhibit[s] or constrain[s] conduct or expression that manifests a central tenet of a person's religious beliefs ..." *Mack*, 80 F.3d at 1179.

Moreover, it has been alleged that the Code imposes such significant restrictions that it would effectively prohibit plaintiffs from engaging in this form of religious activity. Specifically, the Code would permit First English Church to offer meals on *only seven days*, and these days must fall between October 1 and April 1. Consequently, the parish-

ioners would be *completely prohibited* from offering meals to more than thirty people at their church on the other *45 Sundays in the year*. Further, even on the given seven days, it has been alleged that the churches must turn away far more than half of the people who typically attend. Finally, it may be noted that having the Ministry conducted at various locations would not cure the prohibition on the serving of food during the summer months. For these reasons, plaintiffs have thus shown a substantial likelihood of proving that the ordinance would "force [them] to abstain from any action which their religion mandates that they take." *Goodall*, 60 F.3d at 172–73.

### 3. The City Has Not Shown A Compelling State Interest, Nor has it Shown that the Ordinance is The Lest Restrictive Means

It is certainly the case that zoning constitutes one of the most important functions of local government. *Pomponio*, 21 F.3d at 1327 ("We can conceive of few matters of public concern more substantial than zoning and land use laws.") (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). Compatibility of land uses falls within this category as does the need to protect the public safety and general welfare of the people. Yet, such assertions would not constitute compelling state interests to overcome proof of intentional discrimination of a suspect category, such as race. Nor does such conclusory assertions constitute a compelling state interest, here, where there has been a showing of a substantial burden on the free exercise of religion.

Defendants failed to show that there was a compelling state interest in restricting the conduct of the Meal Ministry in its present format and to its present extent. Indeed, they showed only that several complaints had been made over a period of a few days about noise, unruly behavior and urination on private property. No showing was made that the behavior complained of was by the Meal Ministry participants, nor could such a showing be made, according to the testimony of one witness. Defendants also failed to show

that such unruly and disturbing behavior occurred on a regular basis or even on more than one occasion. Preventing a singular occurrence of noise, unruly behavior and unsightly conduct simply would not constitute a compelling state interest where, as here, a substantial burden on the free exercise of religion has been shown. There has been no allegation in this case that the Meal Ministry jeopardizes the public safety, nor that the program has caused acts or threats of violence against neighbors. There has not even been a showing that the program causes traffic jams. Of course, at some point, the threat of having too many people involved in the Meal Ministry may provide a compelling state interest sufficient to justify a substantial burden on the free exercise of religion, but such a threat was not shown to exist. Indeed, there was not even a showing that the number involved in the Meal Ministry exceeds the number of parishioners who attend services on Sunday.

Absent a showing of a compelling state interest, it is not possible to accurately assess whether the Code sections constitute the least restrictive means of achieving that compelling state interest. For example, nothing explains why seasonal limitations are relevant to the achievement of the public safety, health and welfare concerns or the compatibility of land use which the City asserts as justification for the zoning Code. Nor has the numerical limitation been related to those concerns.

Thus, the Court finds that plaintiffs have raised serious, substantial questions respecting whether the Code is the least restrictive means of burdening the free exercise of religion.

### 4. The Public Interest

■ The Court finds that the public interest is served by granting the temporary restraining order because it provides a federal forum for the vindication of federal rights. Here, plaintiffs have been deprived of their free exercise of religion by the state without a hearing. Plaintiffs were prevented from raising these important federal rights in the state process and will not have an opportunity to raise such claims for an extended period of time. The public interest is clearly served by providing a forum to address this important federal question.[4]

### VI. Constitutionality of the RFRA

■ Finally, the Court notes that it is inappropriate to decide the constitutionality of RFRA in a motion for a Temporary Restraining Order. This holds especially true where, as here, most courts have held RFRA to be constitutional. *See Keeler v. Mayor and City Council of Cumberland,* 928 F.Supp. 591 (D.Md.1996) (finding RFRA unconstitutional in contrast with the following courts: *EEOC v. The Catholic University of America,* 83 F.3d 455 (D.C.Cir.1996); *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir. 1996); *Sasnett v. Wisconsin Department of Corrections,* 891 F.Supp. 1305 (W.D.Wis. 1995), aff'd, 91 F.3d 1018 (7th Cir.1996), appeal docketed, No. 95–3924 (7th Cir.); *Belgard v. Hawaii,* 883 F.Supp. 510 (D.Haw. 1995)). Although several courts, including one in this circuit, have found that RFRA violates the separation of powers doctrine, *Keeler,* 928 F.Supp. 591 (D.Md.1996), *see also Hodge v. Magic Valley Evangelical Free Church, Inc.,* 200 B.R. 884 (Bankr.D.Idaho 1996), these rulings alone do not so clearly establish the statute's unconstitutionality to prevent the issuance of a temporary restraining order in this action. The Court will address this issue in due course when a

---

**4.** Defendants also argue that injunctive relief is improper because plaintiffs have an adequate remedy at law. Plaintiffs, defendants argue, have a right to appeal to the Circuit Court of the City of Richmond, and may appeal an adverse ruling at that stage to the Supreme Court of Virginia. Plaintiffs also may apply for a conditional use permit. Defendants' arguments are no different than a reiteration of their claims that the court should abstain from hearing the case, or in the alternative that the plaintiffs' claims are not ripe. Nevertheless, the Court feels compelled to address the issue. As noted earlier, none of these remedies afford plaintiffs with the opportunity to raise their *federal* claim that their right to freely exercise their religion has been abridged. Thus, the remedies are inadequate in that respect. Moreover, there obviously can be no contention that the deprivation of the free exercise of religion may be adequately compensated by damages.

further record and more thorough briefings have been developed.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a temporary restraining order is granted.

It is so ORDERED.